1
2
3
4
5                           UNITED STATES DISTRICT COURT

6                          NORTHERN DISTRICT OF CALIFORNIA

7

8    ANDRE FLEURY, *et al.*,                          No. C-05-4525 EMC

9              Plaintiffs,

10        v.                                    **ORDER RE JOINT MOTION FOR
                                                FINAL APPROVAL OF CLASS
11   RICHEMONT NORTH AMERICA, INC.,             SETTLEMENT**

12             Defendant.                       **(Docket No. 226)**

13   _____/

14

15        Currently pending before the Court is the Settling Plaintiffs[1] and Defendant Richemont North

16   America, Inc.'s joint motion for final approval of class settlement.  *See* Docket No. 226.  Having

17   considered the Settling Parties' motion and accompanying submissions, the Settling Parties'

18   supplemental papers, the response made by class members (both objectors and opt-outs), the oral

19   arguments presented at the hearing on May 7, 2008, and all other evidence of record (including but

20   not limited to the Settling Parties' papers filed in support of and Andre Fleury's papers filed in

21   opposition to the joint motion for preliminary approval), the Court hereby **GRANTS** the joint

22   motion for final approval.

23   ///

24   ///

25   ///

26   ///

27   _____

28        [1] Settling Plaintiffs are Mike Mertaban, Dennis Warner, Charles Cleve, and Liz Hart.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

# I.   FACTUAL & PROCEDURAL BACKGROUND

A.      Allegations of Class Complaint

The operative complaint is the second amended complaint.  *See* Docket No. 145 (SAC, filed on 8/29/2007).  In the complaint, Plaintiffs[2] allege that Richemont has set up an illegal tying arrangement in violation of federal antitrust law.  *See* 15 U.S.C. § 1 (Sherman Act); *see also Newcal Indus. v. Ikon Office Soln.*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) (stating that § 1 of the Sherman Act "governs restraints of trade and tying").

> A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market.  To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product).  Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product.

*Cascade Health Solns. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).[3]

As alleged in the complaint, Richemont is a company in the business of selling, maintaining, and repairing high-end watches throughout the United States, as well as selling replacement parts for such watches.  Richemont manufactures, markets, sells, and distributes its watches under the brand name Cartier.  *See* Docket No. 145 (SAC ¶ 11).  On or about January 1, 2003, "[Richemont] advised all watchmakers, and other resellers of Cartier watches and service, that service on Cartier watches

---

[2] Plaintiffs consist of the Settling Plaintiffs, plus Andre Fleury.  Class counsel initially represented Andre Fleury but later withdrew from the representation, with the permission of the Court, after counsel and Andre Fleury disagreed about the fairness, adequacy, and reasonableness of the settlement.  *See* Docket No. 143 (order, filed on 8/27/07).  Andre Fleury has chosen to opt out of the settlement.

[3] "The Supreme Court has developed a unique per se rule for illegal tying arrangements.  For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market."  *Cascade*, 515 F.3d at 913.

Even if a "tying arrangement survives per se scrutiny, it still must be assessed for invalidity under the rule of reason.  [¶] The Supreme Court has explained that 'the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition.'"  *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1158 (9th Cir. 2001).

1   would 'only be available to consumers through Cartier Retail Boutiques, authorized Cartier watch

2   dealers, and directly with Cartier After Sales Service Department.'"[4]   *Id.* (SAC ¶ 32).  Through this

3   policy and "other anticompetitive practices, [Richemont] has conditioned, and is conditioning, the

4   sale of parts for their watches (the 'tying product') to the consumer's purchase of service,

5   maintenance and repair for such watches from [Richemont] (the 'tied product')."  *Id.* (SAC ¶ 38).

6          As alleged in the complaint, Richemont's illegal tying arrangement has harmed two classes

7   of people: (1) independent watchmakers (*i.e.*, not authorized Cartier watch dealers or repair shops)

8   who were "deprived of the right to purchase Cartier parts for the maintenance, service and repair of

9   Cartier watches, as well as not being able to perform said maintenance, service and repair," *id.* (SAC

10   ¶ 12(a)), and (2) "owners of Cartier watches who have been forced to purchase watch repair and

11   maintenance services from [Richemont] . . . and [who] have been deprived of the cost savings and

12   convenience of equivalent services offered by the [independent] watchmaker[s]."  *Id.* (SAC ¶ 12(b)).

13   B.   Procedural History

14          The lawsuit against Richemont was initiated on November 7, 2005.  *See* Docket No. 1

15   (original complaint).  The original plaintiffs in the action were Andre Fleury, proposed

16   representative for the watchmaker subclass, and Liz Hart, proposed representative for the consumer

17   subclass.  Richemont, along with Cartier International, were named as the defendants in the action.

18   After two rounds of motions to dismiss, Cartier International was dismissed from the case, leaving

19   Richemont as the sole defendant in the case.  *See* Docket No. 73 (order, filed on 10/13/2006).

20          Either during or after this time, the parties initiated fact discovery.  *See* Docket No. 227

21   (Simon Decl. ¶ 3).  The parties exchanged initial disclosures, and, in response to written discovery

22   by the original plaintiffs, Richemont "produced over one million pages of hard copy and electronic

23   documents."  *Id.*  In late 2006, the original plaintiffs took the depositions of three persons designated

24   by Richemont as knowledgeable persons.  *See id.* (identifying those three persons as Senior Vice

25

26

27          [4] Richemont disputes that this was a new policy.  It claims that, "[s]ince at least 1987, [it] has
consistently maintained a policy of refusing to sell watch parts to unauthorized dealers for use in
28   servicing Cartier watches."  Docket No. 181 (2d Jacquenoud Decl. ¶ 12).

**United States District Court**
For the Northern District of California

1    President Martin Gatins, Chief Operating Officer Dan Mawicke, and Assistant Vice President of

2    Logistics Denis Jacquenoud).  Richemont in turn deposed each of the original plaintiffs.  *See id.*

3          On January 4, 2007, counsel for the original plaintiffs and counsel for Richemont met in

4    person to discuss a possible settlement.  *See id.* (Simon Decl. ¶ 4).  No settlement was reached, and

5    therefore the original plaintiffs proceeded with the action by filing an expert report on class

6    certification issues.  *See id.*

7          On May 17, 2007, the original plaintiffs and representatives of Richemont, along with their

8    respective attorneys, participated in a full-day mediation session with the Hon. Edward A. Infante, a

9    former magistrate judge in this District.  *See id.* (Simon Decl. ¶ 5).  Settlement terms were reached

10   during the mediation session.  *See id.*  On June 22, 2007, counsel for the original plaintiffs informed

11   the Court of the settlement.  *See* Docket No. 94 (letter).

12         On June 28, 2007, the Court held a status conference at which time it was informed that

13   counsel for the original plaintiffs was considering filing a motion to withdraw as counsel for Andre

14   Fleury, the proposed representative for the watchmaker subclass.  *See* Docket No. 97 (civil minutes).

15   The Court subsequently referred the case to another magistrate judge for a settlement conference to

16   see if the case could still be settled to the satisfaction of counsel and all parties, including Andre

17   Fleury.  *See* Docket No. 100 (civil minutes, filed on 7/9/07).

18         On July 26, 2007, the Court held a status conference during which the issue of Andre

19   Fleury's communications with members of the proposed watchmaker subclass was discussed.  *See*

20   Docket No. 108 (civil minutes).  Andre Fleury agreed not to communicate with other watchmakers

21   prior to the settlement conference scheduled for August 6, 2007.  *See id.*

22         On August 6, the settlement conference was held with Magistrate Judge Spero.  *See* Docket

23   No. 115 (settlement conference minutes).  A status conference was also held with this Court on the

24   same day.  *See* Docket No. 116 (civil minutes).  During the status conference, the Court made a

25   ruling regarding permissible communications by Andre Fleury with other watchmakers.  The Court

26   also set a briefing schedule for a motion to withdraw as counsel for Andre Fleury and to substitute a

27   representative for the watchmaker subclass in the event that Andre Fleury should decline to sign a

28   stipulation that would allow the settlement to go forward.  *See id.*

4

United States District Court

For the Northern District of California

Andre Fleury did not sign the stipulation and, accordingly, his counsel filed a motion to withdraw as well as a motion to add three new plaintiffs to the case as proposed representatives for the watchmaker subclass.  The Court held a hearing on the motions on August 22, 2007, at which time it granted both motions; formal orders were issued thereafter.  *See* Docket No. 141 (civil minutes); Docket Nos. 143-44 (orders, filed on 8/27/2007).  In the first order, the Court stated that counsel was given leave to withdraw because there had been an irreparable breakdown of relations between counsel and Andre Fleury.  *See* Docket No. 143 (order).  In the second order, the Court found that intervention was appropriate pursuant to Federal Rules of Civil Procedure 23 and 24 as the three individuals had established that a common question of fact and/or law existed with respect to their claims and the claims in the instant case.  The Court also noted that the intervention would not prejudice any of the existing parties in the litigation, including Andre Fleury.  Andre Fleury's former counsel (still counsel for Ms. Hart, the proposed representative for the consumer subclass) then filed the second amended complaint, with the permission of the Court, to reflect the addition of the three new plaintiffs: Mike Mertaban, Dennis Warner, and Charles Cleves.[5]  *See* Docket No. 145 (SAC); *see also* Docket No. 227 (Simon Decl. ¶ 7).

On September 12, 2007, the three new plaintiffs and Ms. Hart (*i.e.*, the Settling Plaintiffs) and Richemont filed a joint motion for preliminary approval of proposed class settlement.  *See* Docket No. 155 (motion).  Andre Fleury filed a letter with the Court, opposing the settlement.  *See* Docket No. 165 (letter, filed on 9/25/2007).  The Settling Parties filed separate reply briefs.  *See* Docket Nos. 166, 169 (reply briefs, filed on 10/3/2007).  Andre Fleury then filed a "sur-reply."  *See* Docket No. 173 (letter, filed on 10/11/2007).  He subsequently filed another set of papers, which the Court struck from the record as he had failed to seek leave of the Court to file additional briefing in violation of the Civil Local Rules.  *See* Docket No. 174 (order, filed on 10/15/2007).

---

[5] As discussed below, ultimately, the Court appointed only Mr. Mertaban, Mr. Warner, and Mr. Cleves as representatives of the watchmaker subclass.  The Court never appointed Andre Fleury as a representative for the watchmaker subclass.  In an order that was issued after preliminary approval, the Court rejected Andre Fleury's argument that he should be appointed a representative because, *inter alia*, papers he had filed in the past suggested that he sought monetary compensation which was unique to him, was unrealistic, and conflicted with the interests of the class as a whole.  *See* Docket No. 202 (order, filed on 11/29/2007).

United States District Court

For the Northern District of California

1    On October 17, 2007, the Court held a hearing on the motion for preliminary approval. *See*

2    Docket No. 175 (civil minutes). During the hearing, the Court expressed concerns about the

3    adequacy of certain terms of the settlement. The Court asked for supplemental papers to be filed and

4    continued the hearing to November 7, 2007. *See id.*; Docket No. 176 (order, filed on 10/17/2007).

5    On October 31, 2007, a further settlement conference was held with Judge Spero. *See*

6    Docket No. 188 (settlement conference minutes). Thereafter, the Court, having reviewed the

7    supplemental papers filed, issued an order asking the parties to be prepared to discuss certain issues

8    at the November 7 hearing. *See* Docket No. 189 (order, filed on 11/5/2007). At the hearing on

9    November 7, the Settling Parties agreed to make certain changes to the settlement. For example,

10   Richemont agreed that it would bear the entire cost of the Cartier-specific tooling, rather than having

11   the qualified watchmaker applicant be responsible for 25% of that cost. *See* Docket No. 197

12   (Amended Stipulation of Settlement ¶ 2.2(a)). Thus, in order to join Defendant's authorized

13   network, a watchmaker would not have to incur any out-of-pocket expenses toward such tooling.

14   The Court thus granted the joint motion for preliminary approval. *See* Docket No. 194 (civil

15   minutes). A formal order was issued on November 28, 2007. *See* Docket No. 200 (order). In the

16   order, the Court conditionally certified for settlement purposes both the consumer subclass and the

17   watchmaker subclass.[6]

18   Thereafter, as discussed in Part I.D, *infra*, notice of certification and the settlement was sent

19   to members of the consumer and watchmaker subclasses. The Court approved notice by mail to the

20   consumer subclass, notice by publication to the watchmaker subclass, and notice by Internet

21   postings, finding that notice by these means (1) constituted the best practicable notice; (2) was

22   reasonably calculated, under the circumstances, to apprise members of the settlement subclasses of

23   the pendency of the lawsuit and of their right to object to or exclude themselves from the settlement;

24   _____

25       [6] The consumer subclass was defined as all persons who currently own or previously owned a
     Cartier watch and who had their Cartier watch repaired or serviced in the United States at a Richemont-
26   owned Cartier boutique or directly by Richemont at any time between January 1, 2003 and November
     28, 2007.

27       The watchmaker subclass was defined as all watchmakers or watch repairers in the United States
28   operating as of November 28, 2007, which are not authorized Cartier dealers or authorized Cartier repair
     shops as of November 28, 2007.

United States District Court

For the Northern District of California

1    (3) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to

2    receive notice; and (4) met all applicable requirements of due process.[7] *See* Docket No. 200 (order,

3    filed on 11/28/2007).

4          Subsequently, the Settling Parties filed the currently pending joint motion for final approval

5    of the settlement, and the Court held the settlement hearing (as reflected in the notice to the

6    subclasses) on May 7, 2008.  During the hearing, the Court further discussed the adequacy of the

7    settlement in light of comments and objections to the proposed settlement received by the Court.

8    For example, with respect to the consumer subclass, the Court asked Richemont whether it would

9    agree to at least a limited aggregation or "stacking" of credits.  Also, with respect to the watchmaker

10   subclass, the Court asked how a watchmaker would be evaluated by Richemont if he or she

11   performed watch repairs on a wholesale basis for a retail store and picked the work up from and

12   delivered it to the retail store.  The Court also discussed with the parties whether a supplemental

13   notice should be sent to certain members of the two subclasses (*i.e.*, the opt-outs or alleged opt-

14   outs), either because it was not clear whether the member did in fact wish to opt out or because the

15   member might want to opt back in based on changes and/or clarifications that had been made to the

16   settlement.

17         Thereafter, the Court issued an order requiring supplemental notice to certain members of the

18   consumer and watchmaker subclasses, with the purpose of (1) clarifying and/or modifying certain

19   terms of the settlement (clarifications and/or modifications were for the benefit of the subclasses)

20   and (2) giving certain members who indicated a possible desire to opt out an opportunity to opt back

21   into the settlement and/or confirm their desire to be excluded.  *See* Docket Nos. 257, 267 (orders,

22   filed on 5/9/2008 and 5/19/2008).  The members of the consumer subclass were informed through

23   the supplemental notice that the settlement now allowed for aggregation up to a maximum of two

24   $100 credits.  The members of the watchmaker subclass were informed through the supplemental

25   notice that (1) the scope of the release was limited to claims that were, or could have been, asserted

26   _____

27       [7] Based on the declaration submitted on behalf of the Settlement Administrator, *see* Docket No.
     229 (Keough Decl. ¶ 4 & Ex. A), the Court finds that, in compliance with the notice provisions of the

28   Class Action Fairness Act, *see* 28 U.S.C. § 1715, Richemont served timely notice of the settlement to
     the appropriate federal and state officials.

based on the facts alleged in the second amended complaint (*i.e.*, the release would not extend to unrelated claims); (2) Richemont's discretion in evaluating watchmaker applicants would be subject to the covenant of good faith and fair dealing, a breach of which could involve the Court; and (3) watchmakers did not need to be employed by or own a retail store in order to apply to become a part of the authorized network but rather could be affiliated with such a store.

C.    Settlement Terms

The following are the essential terms of settlement before the Court.

1.    Consumer Subclass

In exchange for release of the claims that were or could have been asserted based on the facts alleged in the second amended complaint, each member of the consumer subclass shall receive one $100 credit for each qualifying repair service he or she received.  Each member of the consumer subclass shall be automatically entitled to his or her credit(s) without submission of any claim form. The credits may be used only for the purchase of a Cartier product at a Richemont-owned Cartier boutique.  The credits shall be fully transferable but will be void if not used within two years of final Court approval of the proposed settlement. *See* Docket No. 197 (Amended Stipulation of Settlement ¶ 2.3).  As amended by the parties after the hearing herein, a $100 credit may be aggregated up to a maximum of two credits.  *See* Docket No. 258 (letter, filed on 5/9/2008).  Each credit may be used only once.  No unused amounts will be refunded or carried forward as credit.  *See* Docket No. 197 (Amended Stipulation of Settlement ¶ 2.3).

2.    Watchmaker Subclass

In exchange for release of the claims that were or could have been asserted based on the facts alleged in the second amended complaint, Richemont shall expand its network of authorized repair workshops to include all watchmaker applicants that Richemont determines possess the necessary skills, equipment, and premises.  The skills, equipment, and premises of the watchmaker applicants will be evaluated by Richemont pursuant to criteria set forth in a certain evaluation form.  *See* Docket No. 197 (Amended Stipulation of Settlement ¶ 2.1(a)-(c)).  Richemont will have the sole discretion to determine whether an applicant met the criteria set forth in the evaluation form, but such evaluation is subject to the covenant of good faith and fair dealing.  *See* Docket No. 229

1   (Keough Decl., Ex. B at 4) (long-form notice); *id.* (Keough Decl., Ex. C) (publication notice);

2   Docket No. 267 (order, filed on 5/19/2008).  Watchmaker applicants who are determined by

3   Richemont to have met the criteria set forth in the evaluation form will be entitled to repair Cartier

4   watches and purchase spare watch parts for Cartier watches from Richemont in accordance with

5   Richemont's service guidelines for Cartier watches.  Richemont shall not discriminate between

6   newly qualified watchmakers and existing authorized dealers or repair shops with respect to the

7   pricing (with one exception that benefits the watchmakers) or availability of spare parts.

8   Watchmaker applicants and newly qualified watchmakers shall be required to meet and adhere to the

9   same standards of qualify, performance, and training as are required of existing authorized dealers or

10  repair shops generally, failing which they may, in the ordinary course, be terminated from the

11  authorized repair network and thereupon they shall cease to be newly qualified watchmakers.  *See*

12  Docket No. 197 (Amended Stipulation of Settlement ¶ 2.1(d)-(f)).

13       Richemont shall bear 100% of the initial cost of Cartier-specific tooling that a newly

14  qualified watchmaker presently must maintain for performance of repair or service on Cartier

15  watches.  The total cost of the tooling is approximately $2,000.  *See id.* (Amended Stipulation of

16  Settlement ¶ 2.2); *see also* Docket No. 181 (2d Jacquenoud Decl. ¶¶ 3-8) (discussing tooling

17  requirements); Docket No. 182 (Sokol Decl. ¶¶ 3-7) (discussing tooling).  For two years from the

18  date of authorization as a newly qualified watchmaker, newly qualified watchmakers shall be

19  entitled to purchase parts for Cartier watches from Richemont at a 50% discount off list prices,

20  provided that the parts are for the newly qualified watchmakers' own use in repairing or servicing

21  Cartier watches.  The total maximum discount that a newly qualified watchmaker shall receive

22  during the two-year period is $750.  *See* Docket No. 197 (Amended Stipulation of Settlement ¶

23  2.2(b)).

24  D.    Class Response to Settlement

25       Garden City Group, Inc. ("GCG") was engaged by Richemont to implement notice of

26  certification and the settlement -- *i.e.*, to serve as the settlement administrator.  *See* Docket No. 229

27  (Keough Decl. ¶¶ 3-4).

28

United States District Court

For the Northern District of California

9

United States District Court
For the Northern District of California

1.    <u>Consumer Subclass</u>

With respect to the consumer subclass, notice (in its long form[8]) was effected by first-class mail. Richemont provided GCG with what it represented to be a complete list, based on its records, of the members of the consumer subclass. *See id.* (Keough Decl. ¶ 6). That list contained 85,957 names, of which 81,398 corresponded to a last known address. *See id.* GCG updated the last known addresses using the National Change of Address ("NCOA") database maintained by the U.S. Postal Service. *See id.* (noting that, "[a]s result of the NOCA, 9,607 addresses were updated on the Consumer Class List"). On or before January 4, 2008, GCG caused the notice to be mailed by first class to the 81,398 mailing addresses. *See id.* (Keough Decl. ¶ 7).

As of March 30, 2008, a total of 1,520 notices were returned to GCG by the U.S. Postal Service with forwarding address information; these notices were then remailed to the addresses provided. *See id.* (Keough Decl. ¶ 8). As of the same date, a total of 6,276 notices were returned by GCG by the U.S. Postal Service as undeliverable without a forwarding address. *See id.* In other words, a total of 75,122 notices were mailed and *not* returned as undeliverable.[9] *See id.* (Keough Decl. ¶ 9).

GCG directly received a total of 4 timely and complete requests for exclusion. *See id.* (Keough Decl. ¶ 20 & Ex. D) (Nada Eldib, Natalie Minh Nguyen, Martin Samuel, and James J. Shea, Jr.). GCG also directly received a total of 3 timely requests for exclusion which failed to include a telephone number. *See id.* (Keough Decl. ¶ 22 & Ex. F) (Lucy McGrath, Giti Underhill, and L.S. Youngblood). Finally, there was a total of 1 request for exclusion that was complete and timely mailed to settlement class counsel, who in turn provided a copy to GCG. *See id.* (Keough Decl. ¶ 25 & Ex. I) (Judy and Richard Cole).

GCG and/or the Court received a total of 9 timely objections to the settlement.[10]

---

[8] *See* Docket No. 229 (Keough Decl. ¶ 10 & Ex. B) (long-form notice).

[9] $81,398 - 6,276 = 75,122$.

[10] The objections came from John K. Crossman, *see* Docket No. 209; Larry Ehrhardt, *see* Docket No. 210; Bonnie Evans, *see* Docket No. 211; Robert M. Gordon, *see* Docket No. 213; Ann-Rose Kaplan, *see* Docket No. 214; Susanna Jackman, *see* Docket No. 219; Mary Meyer, *see* Docket No. 220; Stephanie Renner, *see* Docket No. 240 (Klisura Decl., Ex. A); and Ronald and Leslie Yoo. *See id.*

After this initial response, the Court held that a supplemental notice should be sent to those consumers who had opted out because Richemont had agreed that a $100 credit could be aggregated with one additional $100 credit. These consumers would be given an opportunity to opt back into the consumer subclass. *See* Docket No. 267 (order, filed on 5/19/07).

GCG issued the supplemental notice to the consumers who had opted out. *See id.* (Horn Decl. ¶ 11 & Ex. E). None of the consumers responded with a statement that he or she wished to withdraw the request to opt out. *See id.* (Horn Decl. ¶ 13).

In sum, out of the 75,122 notices that were mailed and *not* returned as undeliverable, there were 9 objectors and 8 opt-outs. The Court shall recognize all 8 opt-outs as valid.[11]

2.   Watchmaker Subclass

With respect to the watchmaker subclass, notice (in its short, or publication, form[12]) was effected by publication. GCG published the notice in one issue each of *Horological Times*, *Watch Time*, *Clocks magazine*, *Watch & Jewelry Review*, and *hr: Watches* and two consecutive issues of *The Wall Street Journal*. *See id.* (Keough Decl. ¶ 11). All of the notices, except that contained in *Watch & Jewelry Review*, were published on or before January 15, 2008. *See id.* (Keough Decl. ¶ 13). The notice in *Watch & Jewelry Review* was published on January 31, 2008. *See id.* (Keough Decl. ¶ 12).

---

(Klisura Decl., Ex. B).

[11] In their proposed order, the Settling Parties recognize only 4 opt-outs by consumers -- *i.e.*, Nada Eldib, Natalie Minh Nguyen, Martin Samuel, and James J. Shea, Jr. *See* Docket No. 275 (Proposed Final Order, Ex. B). However, Richemont has admitted that Lucy McGrath, Giti Underhill, and L.S. Youngblood could be considered valid opt-outs because they had only "technical flaws" with their requests for exclusion. *See* Docket No. 242 (Def.'s Supp. Br. at 4-5). The Court shall also recognize the opt-out by July and Richard Cole because they too had only a technical flaw with their request for exclusion (*i.e.*, sending the request to settlement counsel instead of GCG directly), and there is no evidence that Richemont would be prejudiced as a result.

[12] *See* Docket No. 229 (Keough Decl. ¶ 14 & Ex. C) (publication notice).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Notice in its long form was also posted on an Internet website maintained by GCG and also provided to the American Watchmakers-Clockmakers Institute ("AWCI") to be posted on its official website.[13]  *See* Docket No. 200 (order, filed on 11/28/2007, at 3-4).

GCG directly received a total of 43 timely and complete requests for exclusion.[14]  *See id.* (Keough Decl. ¶ 20 & Ex. D).  GCG also directly received 1 timely and complete request for exclusion from a person who identified himself as a member of the watchmaker subclass but who also stated that he repaired Atmos clocks (*i.e.*, not Cartier watches).  *See id.* (Keough Decl. ¶ 24 & Ex. H) (Robert Waters).  The Court shall include Robert Waters as an opt-out because there is no prejudice if in fact he does not properly belong to the subclass.  In either event, he should not be bound by the settlement.  In addition, GCG directly received a total of 2 complete but untimely requests for exclusion.  *See* Docket No. 246 (Settling Pls.' Supp. Br., Ex. A) (Jacob Sobell and Alan Garrett); *see also* Docket No. 229 (Keough Decl. ¶ 26 & Ex. J).  Finally, it appears that Andre Fleury himself made a timely and complete request to GCG to opt out.  *See* Docket No. 239 (Andre Fleury Decl. ¶ 2).

GCG also timely received from Andre Fleury a submission which consisted of more than 200 communications between him and other watchmakers.  *See id.* (Keough Decl. ¶ 27); Docket No. 240 (Klisura Decl., Ex. C) (Fleury submission).  Andre Fleury claimed that these communications all consisted of watchmaker requests to opt out.  However, some of the communications came from persons who could not be members of the watchmaker subclass because they were not located in the

---

[13] On its website, the AWCI describes itself as "an international not-for-profit trade association dedicated to the advancement of horology."  http://www.awci.com (last visited June 27, 2008).  None of the parties have suggested posting by any organization other than AWCI, which appears to be the major organization for horologists.

[14] These requests for exclusion were made by the following: American Watch Service (c/o Gonzalo Sanin); Peter Baier (Swiss-Time Ltd.); Remy Battain; Alain Baume (Baume Swiss Jewelers); Jean Bernhard; Richard Cuny; Dion's World of Watches (c/o Dion Zaniewski); Michael Donnellan; Michael Graham; Rob Hays; Paul Highfill; James Hill; Tim Hills; Rudolf Hoellein; John Riesterer Watch Repair; Timothy Kotoski; Donn Krueger; Maurice Lareau; Rick Littlefield; Alexander Loeb; Keith Lovett; Robert Mandrioli; Kenneth Marler; Roger McKee; Meyerland Jewelers (c/o Ronald A. Miller); M. Blake Mobley; Laurence More (Moretime); Paul Niess; Nummi Jewelers (Dale Nummi); Steven Pizzarella; Joseph Prickett; Miguel Puente; Thomas Pullin; Urs Ryser; John Safranek; Jeffrey Schiller; Gerald Schumaker; Herb Self; Paul Shibata; David B. Sydney; Tick Tock Shoppe (Stan Palen); David Walter; and Jerry Watson.

United States.  In addition, some of the communications were "premature" because they were made prior to any approval of the settlement by the Court.  Furthermore, some of the communications were made by watchmakers who had already sent requests to opt out to GCG directly.

GCG and/or the Court received a total of 3 timely objections to the settlement.[15]

After this initial response, the Court held that a supplemental notice should be sent to certain members of the watchmaker subclass.  *See* Docket No. 257 (order, filed on 5/9/2007).  The supplemental notice clarified certain terms of the settlement, more specifically, terms regarding the scope of the release (as being limited to claims which were or would have been asserted based on the facts alleged in the second amended complaint), Richemont's ability to exercise its discretion to reject a watchmaker applicant (as being subject to the covenant of good faith and fair dealing), and treatment of trade watchmaker applicants (permitting watchmakers without their own store front to apply to the network).  *See* Docket No. 267 (order, filed on 5/19/2008).  The Court found such clarification was warranted in view of comments received from those who objected to or opted out of the settlement.

The supplemental notice was sent to the watchmakers who were included in the Settling Parties' list of recognized opt-outs, *see* Docket No. 230 (Proposed Final Order, Ex. B), and these watchmakers were given an opportunity to opt back into the watchmaker subclass.  The supplemental notice was also sent to the two watchmakers who made untimely opt-outs (*i.e.*, Jacob Sobell and Alan Garrett), with these watchmakers also being given the opportunity to opt back into the watchmaker subclass.  In addition, the supplemental notice was sent to some, but not all, of the watchmakers who were part of the Fleury submission[16]; these watchmakers were given the opportunity to clarify whether, based on the supplemental notice regarding the terms of the

---

[15] These objections came from Jon W. Horton, *see* Docket Nos. 215-16; James Sadilek, *see* Docket No. 218; and Sacha Fleury.  *See* Docket No. 224.  The Court also received a communication from David Christianson, *see* Docket No. 217, but it was not clear whether Mr. Christianson intended to object to or opt out of the settlement.  Out of an abundance of caution, the Court instructed that the supplemental notice described *infra* be sent to him.  *See* Docket No. 257 (order, filed on 5/9/2007).

[16] The watchmakers in the Fleury submission who were not given the supplemental notice were (1) those who were not U.S. watchmakers (and hence not part of the class) and (2) those who were duplicative of requests for exclusion and/or objections submitted directly to GCG.  All others (including the "premature" alleged opt-outs) were provided the supplemental notice.

**United States District Court**
For the Northern District of California

1  settlement, they wished to exclude themselves from (*i.e.*, opt out of) the watchmaker subclass.  The

2  Court found this opportunity to clarify their intent was warranted in the interest of justice and out of

3  an abundance of caution, even though their intent to opt out was ambiguous and they did not comply

4  with the opt-out requirements specified in the notice.  The fact that notice was given by publication

5  and that Mr. Fleury's communication with class members may have misled some of them counseled

6  for such caution.  Finally, the supplemental notice was sent to David Berghold, a watchmaker who

7  made a timely submission to GCG but who did not clearly state that he wished to opt out of the

8  settlement.  *See* Docket No. 267 (order, filed on 5/19/2008).

9  　　　GCG issued the supplemental notice to the watchmakers covered by the Court's order of

10 May 19, 2008.  *See* Docket No. 273 (Horn Decl. ¶¶ 3-10).  The response to the supplemental notice

11 was as follows:

12 (1)　　With respect to the watchmakers who were included in the Settling Parties' list of recognized

13 　　　opt-outs, 3 chose to opt back in.  *See id.* (Horn Decl. ¶ 10).  Although not identified by the

14 　　　Settling Parties, the 3 individuals appear to be Alexander Loeb, Robert Mandrioli, and Jerry

15 　　　Watson.

16 (2)　　With respect to the two watchmakers who made untimely opt-outs (*i.e.*, Jacob Sobell and

17 　　　Alan Garrett), *see* Docket No. 246 (Settling Pls.' Supp. Br., Ex. A), neither responded.  *See*

18 　　　Docket No. 272 (Status Rep. at 3).  The Court shall recognize Jacob Sobell's opt-out, but not

19 　　　Alan Garrett's.  Jacob Sobell's opt-out was sent only one day late; Alan Garrett's opt-out

20 　　　was sent almost a month late and no explanation has ever been provided for Alan Garrett's

21 　　　materially late opt-out.  *See* Manual for Complex Litig. § 21.321, at 298 (4th ed. 2004)

22 　　　(noting that a court "may treat as effective a tary election to opt out" and that "[f]actors

23 　　　affecting this decision include the reasons for the delay, whether there was excusable neglect,

24 　　　and whether prejudice resulted"; adding that "[r]elief from deadlines, however, should be

25 　　　granted only if the delinquency is not substantial or if there is good cause shown").

26 (3)　　With respect to the designated watchmakers who were part of the Fleury submission, 59

27 　　　responded with a clarifying statement that they did want to opt out.  *See* Docket No. 273

28 　　　(Horn Decl. ¶ 6).  Although not identified by the Settling Parties, the 59 individuals appear to

**United States District Court**
For the Northern District of California

be: Bo Atkins; Richard Awiza; Arek R. Baizerman; Terry L. Biegert; Karl Buttner; David Capstick; Rick Carey; David Celani; Scott Cerullo; Robert Chaney; Ray Cherry; David A. Christianson; Geoffrey Colber; William Cracraft; Mike Creasey; Wes Cutter; Rob Daugherty; Linda Davis; James Dolley; Paul Duggan; Haris Durakovic; David Fahrenholz; Lowell Fast; Jim Finch, CW; Gregory Gasper; Collette Grigsby; Mark Holder; Maria E. Jara; Mike Katz; Ken Kotoski; Richard Kramer; Robin Laughlin; Carl McCadams; Dwight McCartney; James W. McCarty; Michael McGuire; Donald McPherson; Mark Method; Kent Mikolite; Melvin Mills; Clay Minton; Alexandre Moyse; Anthony Narducy; Gary Neling; Mark Olson; Ronald Peterson; Peter Pronko; Eric Sagers; Frank Scafidi; Robert Shans; Curtis D. Thompson; Ernst Tope; Terry Tuttrup; Hugo Villalta; Sandra Walker; Sheldon Warren; Dominique Wieland; Thomas Wilczynski; and Mark Yusko.  In addition, one watchmaker who was part of the Fleury submission -- Robert Fesler -- sent in a request for exclusion but it was not clear to GCG whether the request was timely made because the postmark on the envelope was not clear.  GCG received the request by Robert Fesler on June 23, 2008, *i.e.*, ten days after the deadline for sending a request to opt out.  *See* Docket No. 277 (2d Horn Decl. ¶ 3).  The Court shall recognize the opt out by Robert Fesler since it was made close in time to the deadline for sending a request to opt out.

GCG also received communications from watchmakers who were *not* covered by the Court's order of May 19, 2008, including those now seeking to opt out for the first time.  *See id.* (Horn Decl. ¶¶ 14-16).  The Court shall not consider these communications because they were sent by watchmakers who were not covered by the Court's order.  The Court's order allowed those who opted out a chance to opt back in and permitted those whose communications, though timely, were ambiguous as to their intent.  The order did not reopen the opt-out period for those class members who entirely missed the original opt-out deadline.  Such belated attempts to opt out will not be recognized.  Moreover, some of these watchmakers are not even part of the watchmaker subclass, *e.g.*, because they are not located in the United Sates.  *See id.* (Horn Decl. ¶ 14).  As to the watchmaker James Sadilek, *see id.* (Horn Decl. ¶ 16), the Court notes that he previously -- and unequivocally -- chose to make only an objection to the settlement, and not a request for exclusion.

1   *See* Docket No. 218.  The Court sees no reason why James Sadilek should not be held to his decision

2   to object, rather than opt-out.

3       In sum, in response to the notice and supplemental notice to the watchmaker subclass, the

4   Court finds there were a total of 3 formal objectors and 106 opt-outs.

5                           **II.   DISCUSSION**

6   A.      Certification of Settlement Subclasses

7       As noted above, at the time the Court granted preliminary approval of the settlement, it

8   conditionally certified for settlement purposes both the consumer and watchmaker subclasses.  It

9   also appointed class counsel and representatives for the two subclasses.  *See* Docket No. 200 (order,

10  filed on 11/28/2007).  Because the Court's order did not contain the specific factual findings and

11  legal conclusions underlying its conditional certification decision, and since the Court must now

12  finally certify the class for settlement,[17] the Court makes the following findings and conclusions.

13      Under Federal Rule of Civil Procedure 23(b)(3),

14          [a] class action may be maintained if Rule 23(a)[[18]] is satisfied and if:

15          . . . .

16

17  _____

18      [17] Before certification is proper for any purpose, including settlement, the Court must ensure the requirements of Rule 23(a) and (b) have been met.  *See Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1176 (9th Cir. 2007); *Denny v. Deutsche Bank, A.G.*, 443 F.3d 253, 270 (2d Cir. 2006).

19

20      [18] Rule 23(a) provides that

21          [o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if:

22          (1)   the class is so numerous that joinder of all members is
23                impracticable;

24          (2)   there are questions of law or fact common to the class;

25          (3)   the claims or defenses of the representative parties are typical of
                  the claims or defenses of the class; and

26          (4)   the representative parties will fairly and adequately protect the
27                interests of the class.

28  Fed. R. Civ. P. 23(a).

United States District Court
For the Northern District of California

(3)     the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The Supreme Court has clarified that, when a court is "[c]onfronted with a request for settlement-only class certification," as here, it "need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

1.     <u>Numerosity</u>

Under Rule 23(a), the first requirement for maintaining a class action is that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[I]n determining whether a class is so 'numerous' that joinder is impracticable, the most important factor is the absolute size of the proposed class. . . . [A] class defined so as to include an extremely large number of class members may, by itself, establish that joining all class members would be impracticable."  5-23 Moore's Fed. Prac. -- Civ. § 23.22[1][b]; *see also Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000) (noting that, although impracticability is not measured strictly by number, "numbers are important" and "courts have found that numerosity is satisfied when class size exceeds 40 members").  Wide geographic dispersion of class members also supports a finding of impracticability of joinder.  *See, e.g.*, *Tietz v. Bowen*, 695 F. Supp. 441, 445 (N.D. Cal. 1987) (finding that "the class is so numerous that joinder of all members is impracticable" because, "[w]hile the class as redefined will only include about twenty-seven members, the class members are geographically diverse and, as retirees, may not have the means to bring individual suits").

In the instant case, the consumer subclass contains over 80,000 members who are located throughout the United States.  *See* Keough Decl. ¶ 6 (noting that Richemont provided GCG with what it represented to be a complete list, based on its records, of the members of the consumer subclass, which contained 85,957 names).  Likewise, the members of the watchmaker subclass are located throughout the United States and, though their exact numbers have not been proven, the evidence indicates that the number is significant, a point that is not in real dispute by any of the parties or any member of the watchmaker subclass.  *See, e.g.*, Docket No. 248 (Andre Fleury Decl. ¶ 34) (claiming that, according to the 2006 U.S. Department of Labor statistics, "there are approximately 3,050 persons who identify themselves as watch repairers in the United States" and estimating that, based on his 45 years in the watchmaking industry, "approximately one-half of this amount are not independent watch repairers and watchmakers").[19]  In light of the numbers and geographic diversity, the Court finds that joinder is impractical.

    2.    Commonality

The second requirement under Rule 23(a) for maintaining a class action is that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Dukes*, 509 F.3d at 1177 (internal quotation marks omitted).  Ultimately, "[t]he commonality test is qualitative rather than quantitative -- one significant issue common to the class may be sufficient to warrant certification."  *Id.*

In the instant case, the commonality requirement is easily met.  The overarching claim of members of both subclasses is that Richemont illegally tied the sale of Cartier watch parts to the sale of Cartier watch repair service.  The facts and law which inform the merits of that claim are common to all class members.

---

[19] The Court notes that Andre Fleury did not attach to his declaration any documents from the Department of Labor substantiating such.  The Court also notes that, in his previous filings, Andre Fleury claimed that there are approximately 6,000 independent watchmakers.  *See* Docket No. 165 (letter, filed on 9/25/2007); Docket No. 173 (letter, filed on 10/11/2007).

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

3.      Typicality

The third requirement under Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "This 'typicality' requirement attempts to ensure that the representative parties' (named plaintiffs') interests are substantially aligned with those of absent class members."  5-23 Moore's Fed. Prac. -- Civ. § 23.24[1].  The Ninth Circuit has held that "representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.  Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality."  *Dukes*, 509 F.3d at 1184 (internal quotation marks omitted).

In the instant case, the claims of the proposed representative of the consumer subclass (*i.e.*, Ms. Hart) are typical of the claims of that subclass.  The injury allegedly suffered by Ms. Hart and the rest of the consumer subclass "resulted from the same allegedly [anticompetitive] practice."  *Id.*; *see also* 5-23 Moore's Fed. Prac. -- Civ. § 23.24[2] ("The class representative satisfies the typicality requirement if the class representative's claims arise from the same events, practice, or conduct, and are based on the same legal theory, as those of other class members.").  She, like other members of the consumer subclass, faced a restricted market of watchmakers who could service Cartier watches.

As above, the claims of the representatives of the watchmaker subclass (*i.e.*, Mr. Mertaban, Mr. Warner, and Mr. Cleves) are typical of the claims of that subclass because the injury allegedly suffered by these individuals and the rest of the consumer subclass "resulted from the same allegedly [anticompetitive] practice."  *Dukes*, 509 F.3d at 1184; *see also* Docket No. 144 (order, filed on 8/27/2007) (stating that "Mr. Mertaban, Mr. Warner and Mr. Cleves have established that a common question of law and/or fact exists with respect to their claims and the claims in the instant case").  They, like other members of the watchmaker subclass, suffered from being excluded for access to Cartier repair parts.

4.      Adequacy of Representation

Finally, under Rule 23(a), a class action may be brought only if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the

United States District Court

For the Northern District of California

1   proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." *Dukes*,

2   509 F.3d at 1185; *see also Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003) ("Adequate

3   representation depends on the qualifications of counsel for the representatives, an absence of

4   antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that

5   the suit is collusive.") (internal quotation marks omitted).

6          With respect to the representative of the consumer subclass (*i.e.*, Ms. Hart), she does not

7   have a conflict of interest with that subclass.  For example, there is no evidence that she is subject to

8   a unique defense that could become a focus of the litigation.  *See Gary Plastic Packaging Corp. v.

9   Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (stating that "class

10  certification is inappropriate where a putative class representative is subject to unique defenses

11  which threaten to become the focus of the litigation").  Nor is there any evidence that she is or

12  appears to be prosecuting the class action for the benefit of class counsel rather than for the benefit

13  of the class.  *See* 5-23 Moore's Fed. Prac. -- Civ. § 23.25[2][b][vi]; *see also Molski v. Gleich*, 318

14  F.3d at 955.

15         Likewise, with respect to the representatives of the watchmaker subclass (*i.e.*, Mr. Mertaban,

16  Mr. Warner, and Mr. Cleves), there is nothing to indicate that they have a conflict of interest with

17  that subclass.  Indeed, the Court previously rejected the contention of Andre Fleury that Mr. Warner

18  and Mr. Cleves have a conflict of interest.  *See* Docket No. 144 (order, filed on 8/27/2007).

19  Furthermore, the Court finds no evidence has been presented of collusion between the three

20  representatives and class counsel.  The fact that the individuals came into the litigation late in the

21  proceedings, and disagreed with Andre Fleury's assessment of the settlement, does not establish

22  collusion.  There is no evidence, *e.g.*, that the individuals did not review the terms of the settlement.

23         That the original class representative, Andre Fleury, found himself disagreeing with and

24  objecting to the settlement negotiated by class counsel (which led to his replacement by the three

25  new representatives) does not establish collusion.  The Court notes that, previously, it rejected

26  Andre Fleury's appointment as class representative because, *inter alia*, papers he had filed in the

27  past suggested that he sought monetary compensation which was unique to him, was unrealistic

28  (especially as not supported by any substantial documentation), and conflicted with the interests of

United States District Court

For the Northern District of California

1   the class as a whole.  *See* Docket No. 202 (order, filed on 11/29/2007).  *See, e.g.*, Docket No. 173

2   (letter, filed on 10/11/2007) (claiming that, "for the 5 years that I was denied parts, this would have

3   been 4,085 repairs at Cartier's average price of $914.5 -- a total of *$3,735,9732*") (emphasis in

4   original); Docket No. 248 (Andre Fleury Decl. ¶ 3) (claiming that, on average, he earned in excess

5   of $300,000 per year in revenue from Cartier watches alone).  Thus, the Court found that Mr. Fleury

6   was not an adequate representative of the watchmaker subclass and that counsel's action in

7   withdrawing from his representation was reasonable.

8           As to the adequacy and competency of class counsel, both the evidence presented, *see*

9   Docket No. 157 (Simon Decl. ¶¶ 12-14 & Exs. A-B), and the Court's own knowledge and

10  experience are sufficient to establish such.  *See* Part II.B.6, *infra*.  The Court acknowledges that

11  Sacha Fleury (Andre Fleury's son and an objector to the settlement) has made several arguments as

12  to why class counsel are inadequate, but none of the arguments are persuasive.

13          First, Sacha Fleury asserts that class counsel are inadequate because they improperly

14  negotiated the settlement, discarding Andre Fleury as the proposed representative of the watchmaker

15  subclass once he objected to the settlement terms and finding new persons to take his place.  That a

16  disagreement arose between class counsel and Andre Fleury, however, does not establish that

17  counsel are inadequate.  Even prior to class certification, counsel had a fiduciary duty to the class,

18  and not just Andre Fleury, *see In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768,

19  801 (3d Cir. 1995) (stating that, "[b]eyond their ethical obligations to their clients, class attorneys,

20  purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is

21  filed")[20]; *Schick v. Berg*, No. 03 Civ. 5513 (LBS), 2004 U.S. Dist. LEXIS 6842, at *18 (S.D.N.Y.

22  Apr. 20, 2004) (stating that "pre-certification class counsel owe a fiduciary duty not to prejudice the

23  interests that putative class members have in their class action litigation" because "class counsel

24  acquires certain limited abilities to prejudice the substantive legal interests of putative class

25  members even prior to class certification"); *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp.

26  2d 1239, 1245 (N.D. Cal. 2000) (noting that "lead counsel owes a generalized duty to unnamed class

27

28          [20] In *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003), the Ninth Circuit indicated its
    agreement with this statement in *GMC.  See id.* at 960.

United States District Court

For the Northern District of California

1    members [prior to certification]").  Counsel believed that the settlement to which Andre Fleury

2    objected was ultimately beneficial to the class.  *See* 5-23 Moore's Fed. Prac. -- Civ. §

3    23.120[2][c][ii] ("In a class action, class counsel might need to act independently of the desires of

4    the class representatives if and when class counsel believes that to be in the interest of the class as a

5    whole.").  Watchmakers other than Andre Fleury agreed with class counsel as demonstrated by the

6    fact that Mr. Mertaban, Mr. Warner, and Mr. Cleves decided to join the litigation as proposed

7    representatives for the watchmaker class.  Moreover, only a small fraction of all independent

8    watchmakers have opted out or objected to the proposed settlement.  As noted above, given Andre

9    Fleury's questionable position regarding the settlement, class counsel had good reason to replace

10   him with adequate class representation.

11           Second, Sacha Fleury asserts that class counsel are inadequate because they represent both

12   the consumer subclass and the watchmaker subclass even though the subclasses have a conflict of

13   interest.  *See* Newberg on Class Actions § 7:37 (stating it is "possible for the same class counsel to

14   represent two subclasses in the same action, if there is no conflict between the subclasses").

15   According to Sacha Fleury, there is a conflict between the subclasses because recovery for one

16   subclass (*i.e.*, the consumers) dilutes recovery for the other subclass (*i.e.*, the watchmakers), *see*

17   Docket No. 249 (Sacha Fleury's Obj. at 12) (asserting that "the settlement coupons to be given to

18   consumers reflect a diversion of funds from the watchmakers, who received nothing from Cartier for

19   their business losses").  However, under the settlement, both the consumers and the watchmakers are

20   given benefits.  The fact that the benefits for the consumers are different from the benefits for the

21   watchmakers does not mean, therefore, that funds were diverted from the watchmaker subclass to

22   the consumer subclass.  There is nothing to indicate that the settlement terms of one subclass came

23   at the expense of the other.  Sacha Fleury's real beef (as well as his father's) seems to be that, under

24   the settlement, the consumer subclass will obtain a cash-like award and the watchmaker subclass

25   will not.  But, as discussed below, the terms of the settlement are fair and adequate.

26           Third, Sacha Fleury contends that class counsel are inadequate because they were acting in a

27   conflict of interest by negotiating their fees as part of their clients' settlement.  But, contrary to what

28   Sacha Fleury asserts, there is no evidence that class counsel negotiated their fees as part of the

settlement.  *See* Docket No. 197 (Amended Stipulation of Settlement ¶ 5.2) (stating that "[t]he attorneys' fees and special awards to the class representatives were negotiated through the mediator *after* the terms of the settlement were agreed upon and were not discussed before such time") (emphasis added).  Indeed, even Andre Fleury's account of the events suggests that fees were not negotiated until after the settlement terms were agreed upon.  *See generally* Docket No. 248 (Andre Fleury Decl.).  Furthermore, while, under the settlement, there is a cap of $2 million in fees and Richemont agrees not to oppose the fee application, ultimately, the amount of fees is to be determined by this Court.  *See* Docket No. 197 (Amended Stipulation of Settlement ¶ 5.2) (stating that the award of any fees and costs "shall be the subject of an order entered by the Court, which will not be part of the judgment of dismissal entered on the final approval of the settlement"); *see also* Fed. R. Civ. P. 23(h) (providing that only *reasonable* fees may be awarded).  No fees are guaranteed to class counsel under the settlement.

### 5.    Predominance and Superiority

For the reasons stated above, all four requirements of Rule 23(a) have been met in the instant case.  In order for the Court to certify the subclasses, however, it must also find, in accordance with Rule 23(b)(3), that (1) common questions of law or fact predominate over questions affecting only individual members and (2) a class action is superior to other available methods for resolving the controversy.  *See* Fed. R. Civ. P. 23(b)(3).

The Court holds that the first requirement has been met.  "'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Hanlon*, 150 F.3d at 1022.  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  In the instant case, each subclass is sufficiently cohesive and the two subclasses are also sufficiently cohesive because the liability issues are all essentially the same based on the same factual predicate -- *i.e.*, that, on or about January 2003, Richemont implemented a new policy pursuant to which "service on Cartier watches would 'only be available to consumers through Cartier Retail Boutiques, authorized Cartier watch dealers, and directly with Cartier After Sales Service Department.'" SAC ¶ 32; *cf. Hardy v. City*

United States District Court
For the Northern District of California

1    *Optical, Inc.*, 39 F.3d 765, 771 (7th Cir. 1994) (rejecting lower court's conclusion that "antitrust

2    suits, at least when they involve issues of coercion and damages, are not appropriate for class

3    treatment"; explaining that the issue of coercion did not create an "unworkable complexity" because

4    defendant had blanket policy of refusing to give patients their contact lens specifications for use at

5    another optometrist's office). The legal question (discussed in greater detail below) as to whether

6    this conduct violates antitrust law is common to all class members. The Court notes that, because

7    common questions predominate over individual questions as to liability, the predominance standard

8    of Rule 23(b)(3) is satisfied, "even if individual damages issues remain." 5-23 Moore's Fed. Prac. --

9    Civ. § 23.45[2][a].

10            The Court further holds that the second requirement has been met. As the Settling Parties

11   argue, "a class action is certainly superior because it would be a waste of judicial resources to

12   require numerous individual trials," particularly where, as here, "the damages alleged by individual

13   members of the Settlement Class are relatively small, and the expense and burden of individual

14   litigation would make it, for all practical intents and purposes, impossible for them to seek redress

15   individually." Mot. at 10-11. Moreover, since certification is for settlement purposes, the

16   settlement provides for a prescribed formula for damages. For consumers, no further adjudication is

17   required. For watchmaker, further adjudication is unlikely and confined to possible disputes as to

18   whether any rejection by Richemont of watchmaker applicants complies with the covenant of good

19   faith and fair dealing.

20            Because both requirements of Rule 23(b) have been met, as well as the requirements of Rule

21   23(a), final certification of the both the consumer and watchmakers subclasses, as defined in note 5,

22   *infra*, is appropriate.

23   B.      Fairness, Adequacy, and Reasonableness of Settlement

24            The Court now turns to the issue of whether or not the settlement agreed to by the Settling

25   Parties should be approved. Federal Rule of Civil Procedure 23(e) provides that "[t]he claims,

26   issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only

27   with the court's approval." Fed. R. Civ. P. 23(e). Whether a class action is certified for settlement,

28   as here, or certified for trial and later settled, a court may approve the settlement only after

United States District Court

For the Northern District of California

1  determining that the settlement is fair, adequate, and reasonable.  *See* Manual of Complex Litigation

2  § 21.61, at 308 (4th ed. 2004).   "[S]ettlement approval that takes place prior to formal class

3  certification requires a higher standard of fairness."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026

4  (9th Cir. 1998).  But "[i]t is the settlement: taken as a whole, rather than the individual component

5  parts, that must be examined for overall fairness."

6             In determining whether a settlement agreement is fair,
       adequate, and reasonable to all concerned, a district court may
7      consider some or all of the following factors:

8      the strength of plaintiffs' case; the risk, expense, complexity, and
       likely duration of further litigation; the risk of maintaining class action
9      status throughout the trial; the amount offered in settlement; the extent
       of discovery completed, and the stage of the proceedings; the
10     experience and views of counsel; the presence of a governmental
       participant; and the reaction of the class members to the proposed
11     settlement.

12  *Molski*, 318 F.3d at 953.

13        Taking into account the above factors, the Court concludes that the settlement proposed by

14  the Settling Parties is fair, adequate, and reasonable.

15        1.     Strength of Plaintiffs' Case

16        To state the matter simply, there are significant weaknesses to Plaintiffs' claim of illegal

17  tying.  Sacha Fleury asserts that the case is a strong one as it is on "all fours" with *Eastman Kodak*

18  *Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), but the facts in *Kodak* are materially

19  distinguishable from those in the instant case.

20        In *Kodak*, the plaintiffs were independent service organizations ("ISOs") that serviced Kodak

21  copying and micrographic equipment.  They claimed that Kodak had engaged in illegal

22  anticompetitive conduct by adopting policies that limited the availability of parts to ISOs and made

23  it more difficult for the ISOs to compete with Kodak in servicing Kodak equipment.  Those policies,

24  according to the plaintiffs, were successful and customers were forced to switch to Kodak service

25  even though they preferred ISO service.  *See id.* at 457-58.

26        The allegations made by Plaintiffs in the instant case bear some surface similarity to those

27  made by the plaintiffs in *Kodak*.  But the critical question is whether, in the instant case, consumers

28  were forced to switch to service provided by *Richemont* rather than service provided by independent

United States District Court

For the Northern District of California

watchmakers -- just as the customers in *Kodak* were forced to switch to service provided by Kodak instead of service provided by ISOs.  There is no real dispute that (as revealed by discovery) there are approximately 50 watch repair shops that are independent of Richemont and that provide Cartier watch repair and service, as well as parts.  *See* Docket No. 184 (Settling Pls.' Supp. Br. at 8).  There is no evidence that Richemont has a direct economic interest in the sale of Cartier watch repair service by these independent watchmakers who are part of the authorized network.  Thus, while under the challenged policy it appears that parts for repairs are available through the authorized Cartier network, a significant part of that network are *economically independent* of Richemont.  This fact distinguishes the instant case from *Kodak*.  Plaintiff would have to extend *Kodak* to the facts of this case in order to prevail on liability.  What little case law there is in this area appears problematic.  *See Sports Racing Servs. v. Sports Car Club of Am.*, 131 F.3d 874, 887-88 (10th Cir. 1997) (noting that "[a]n illegal tie may be found where the seller of the tying product does not itself sell the tied product but merely requires the purchaser of the tying product to buy the tied product from a designated third party rather than from any other competitive source that the buyer might prefer" but adding that, "where a third party is involved in selling the tied product to the plaintiff, most courts have required that the tying product seller have a direct economic interest in the sale of the tied product before an illegal tying arrangement will be found"); *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1407-08 (9th Cir. 1984) (holding no illegal tying arrangement where airline offered discount air fares -- the tying product -- only if the customer purchased car rental services from a designated third party because there was no showing the airline had an adequate economic interest in the car rentals); *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476, 1479-81 (9th Cir. 1983) (examining whether seller of tying product had an economic interest in the tied product sold by a third party).

The extension or not of *Kodak* aside, there are additional risks in Plaintiffs' case that cannot be dismissed as inconsequential.  In particular, even if Plaintiffs could prove tying, Richemont might have an affirmative defense -- *i.e.*, that the tying arrangement was justified by a legitimate business purpose, namely, preserving the integrity of the Cartier brand and controlling the quality of repairs provided to consumers of Cartier products.  The Ninth Circuit has expressly "recognized that

United States District Court
For the Northern District of California

1    antitrust defendants may demonstrate a business justification for an otherwise per se illegal tying

2    arrangement" and that "[a] tie-in does not violate the antitrust laws 'if implemented for a legitimate

3    purpose and if no less restrictive alternative is available.'"  *Mozart Co. v. Mercedes-Benz of N. Am.,*

4    *Inc.*, 833 F.2d 1342, 143-49 (9th Cir. 1987).  Notably, in *Mozart*, the Ninth Circuit concluded that

5    "there was ample evidence to support a finding that the tying arrangement [*i.e.*, conditioning the sale

6    of the Mercedes-Benz franchise trademark and automobiles on the purchase of replacement parts

7    from defendant exclusively] is a legitimate means of maintaining the quality of Mercedes

8    replacement parts supplied by dealers, and thereby protecting the reputation of the MBNA product."

9    *Id.* at 1351.  The court also held that there was "substantial evidence to support the jury's finding

10   that the only feasible method for maintaining quality control is the use of the tying arrangement."

11   *Id.*

12         Furthermore, even if the trier of fact were to reject the business justification defense

13   proffered by Richemont, another obstacle would be proof of damages, for the watchmaker subclass

14   in particular.  Although the watchmakers could testify about the losses they sustained as a result of

15   Richemont's actions, the most compelling evidence would be documentary evidence.  It is

16   questionable whether watchmakers would maintain records documenting watch repairs that they had

17   to turn down, let alone Cartier watch repairs that they had to turn down and only because of the

18   unavailability of parts.  To the extent that the trier of fact could rely on a watchmaker's past Cartier

19   watch repairs to estimate how many Cartier watch repairs were turned down after Richemont

20   implemented its allegedly new policy on or about January 1, 2003, it is possible that many

21   watchmakers would not have kept records prior to that date.  Even if they did, it is possible that the

22   records would not reflect that repairs had been done for a Cartier watch specifically.  It is worth

23   noting that, during his deposition, Andre Fleury admitted that he himself had no records to support

24   his alleged loss in revenue.  *See* Docket No. 180 (2d Gallagher Decl., Ex. F (Fleury Depo. at 86)

25   (testifying that he did not know of any records that would reflect the alleged decrease in revenue).

26         2.    Risk, Expense, Complexity, and Likely Duration of Further Litigation

27         Absent settlement, the risk, expense, complexity, and likely duration of further litigation

28   would be substantial.  Richemont would oppose the request for class certification, *see* Docket No.

**United States District Court**
For the Northern District of California

1   179 (Def.'s Supp. Br. at 10-13), and, even assuming that class certification would be granted (for

2   reasons similar to those articulated by the Court above, *see* Part II.A, *supra*), the merits of the case

3   would be disputed, both with respect to complex legal issues (*e.g.*, is this case analogous to *Kodak*)

4   and complex factual issues (*e.g.*, is there a legitimate business justification for the alleged tie-in),

5   which would more than likely require extensive expert testimony.

6           3.      Risk of Maintaining Class Action Status Throughout the Trial

7           Under the settlement, Richemont agreed to certification for settlement purposes only.

8   Absent the settlement, Richemont would oppose the request for class certification, and thus there is

9   some risk that Plaintiffs would not be able to maintain class action status throughout the trial.

10  Furthermore, even assuming certification would be granted (for reasons similar to those articulated

11  by the Court above, *see* Part II.A, *supra*), "there is no guarantee that [Richemont] would not move

12  for and obtain decertification of the [subclasses] before or during trial.  As noted by one court, if

13  'insurmountable management problems were to develop at any point, class certification can be

14  revisited at any time under Fed. R. Civ. P. 23(c)(1).'"  *Rodriguez v. West Publ. Corp.*, No.

15  CV05-3222 R (MCx), 2007 U.S. Dist. LEXIS 74767, at *29 (C.D. Cal. Sept. 10, 2007).

16          4.      Amount Offered in Settlement

17          The settlement provides for benefits to both the consumer and watchmaker subclasses.

18          The benefits to the consumers are limited, but not inconsequential.  Although consumers are

19  not being cash outright, they will be given a credit(s) without the burden of having to go through any

20  claims process, and the credit(s) is fully transferable and valid for two years.  Also, although most

21  Cartier products cost substantially more than $100, consumers are permitted to aggregate two

22  credits, and there are more than 50 separate Cartier products available through Richemont-owned

23  Cartier boutiques that are priced at or below $100, and another 116 separate items for between $100

24  and $250.  *See* Docket No. 181 (2d Jacquenoud Decl. ¶¶ 18-21 & Exs. B-C).  Moreover, if $200 in

25  credits were aggregated, that would constitute a significant discount on other items costing several

26  hundred dollars.  Finally, it must be kept in mind that had this case proceeded to trial and Plaintiffs

27  were able to overcome the obstacles to establishing liability, the potential recovery of consumers

28  would consist of only the cost savings that they allegedly would have achieved through lower

United States District Court

For the Northern District of California

1  pricing by independent watchmakers, a showing which would be difficult to make and which would

2  ultimately prove less than substantial in dollar amount.

3          Similar to above, the benefits of the settlement to the watchmakers, although also limited, are

4  not inconsequential.  Richemont has agreed to expand its network of authorized repair workshops.

5  Although Richemont has only agreed to include those watchmaker applicants that it deems qualified

6  and qualification depends in part on subjective factors, Richemont has presented a legitimate reason

7  to include those subjective factors -- *e.g.*, the appearance of a watchmaker's shop (assuming that he

8  or she has point of sale contact with consumers) is relevant to preserving the integrity of the Cartier

9  brand.  In addition, although Richemont has discretion to determine whether or not a watchmaker

10  applicant is qualified, that discretion is limited, *i.e.*, subject to the covenant of good faith and fair

11  dealing and the Settling Parties agree that the Court may become involved should a breach of that

12  covenant be asserted.

13          For those watchmaker applicants that are deemed qualified, they are entitled to all current

14  tooling required by Richemont for servicing Cartier watches -- the cost of which is approximately

15  $2,000 -- at no cost.  In addition, for two years, they are entitled to purchase parts for Cartier

16  watches at a 50% discount, for a total maximum discount of $750.  These benefits are not worthless.

17  Although Sacha Fleury asserts that the tooling is irrelevant, there is no evidence to support such.[21]

18  Indeed, the evidence suggests otherwise.  *See* Docket No. 181 (2d Jacquenoud Decl. ¶¶ 4-7 & Ex. A)

19  (explaining that many of the tools are specific to a particular model of Cartier watch and that some

20  of the tools are used in performing specific tasks on specific Cartier models; adding that all

_____

22  [21] Contrary to what Sacha Fleury claims, the declaration of Andre Fleury, *see* Docket No. 248, does not address the tooling.  *See* Docket No. 249 (Sacha Fleury Obj. at 6).

23  In a letter filed with the Court on September 25, 2007, Andre Fleury did represent to the Court
24  that he has "repaired Cartier watches for 40 years and no special tools were ever proposed to me," Docket No. 165 (letter), but that statement was not provided under penalty of perjury.  Andre Fleury also
25  represented in the letter that another watchmaker, Jean Bernhard, "was contracted by Cartier [International] [in 1994 and 1995] to repair 280 of their watches [and] no tools were given, suggested,
26  or proposed to him," *id.*, but that statement too was not provided under penalty of perjury.  Nor was the letter allegedly sent by Mr. Bernhard authenticated.  Even if it were, the letter constitutes hearsay and
27  has marginal relevance since Mr. Bernhard was discussing events more than a decade old.

28  Similarly, the letter filed by Andre Fleury on October 11, 2007, also was not submitted under penalty of perjury.  *See* Docket No. 173 (filed on 10/11/2007).

United States District Court

For the Northern District of California

1   Richemont-authorized repair shops are required to purchase and use the tooling "except certain

2   shops that have been authorized only to perform routine maintenance service or to perform repairs

3   on some, but not all, Cartier watch models, which may require a smaller inventory of required

4   tools"; and noting that the repair shops are charged only a wholesale price for each tool, which is

5   "roughly equivalent to [Richemont's] cost for such tools"); *see also* Docket No. 182 (Sokol Decl. ¶¶

6   3-7) (discussing tooling).  In any event, after the hearing on preliminary approval, Richemont agreed

7   to make the tools available to authorized repairers free of charge.

8           As to Sacha Fleury's contention that the discount on parts has no value because Richemont

9   controls the list price and can inflate the list price to make any discount meaningless, this is an

10   unlikely scenario since the list price is what is charged to all authorized watch repair shops, not just

11   the newly qualified watch applicants.  *See* Docket No. 197 (Amended Stipulation of Settlement ¶

12   2.1(e)) (providing that Richemont shall not discrimination between newly qualified watchmakers

13   and existing authorized dealers or repair shops).

14           Because the free $2,000 tooling and $750 discount on parts do have value, Sacha Fleury's

15   contention that, under the settlement, the watchmakers will not receive any compensation for the

16   loss of business they sustained is not true.  The lack of any additional compensation is not unfair

17   since, as discussed above, many watchmakers would likely have difficulty proving the loss of

18   business.  Finally, it is worth noting that, with respect to the communications that make up the

19   Fleury submission, many of the watchmakers did not claim to have turned away any number of

20   Cartier watch repairs[22]; for those who did, many claimed to have turned away only a small number

21   of repairs each year (20 or fewer).  While some watchmakers claimed that they turned away

22   significant numbers of repairs (50-100 or more), these watchmakers were given the opportunity to

23   opt out.

24           5.      Extent of Discovery Completed and Stage of Proceedings

25           As noted above, a significant amount of discovery has taken place in the instant case, in

26   particular, discovery related to class certification.  Moreover, the case has gone through two rounds

27   _____

28           [22] Andre Fleury provided watchmakers with a form to fill out, which included in part the
following statement: "Due to Cartier's parts restriction I had to turn away _____ Cartier repairs yearly."

United States District Court

For the Northern District of California

1  of motions to dismiss and, at the time of settlement, was ready to go into the certification phase.  At

2  the time of settlement, the case had been litigated for approximately a year and a half.

3         6.     Experience and Views of Counsel

4        Class counsel has significant experience, both with respect to class actions as well as

5  antitrust litigation.  *See* Docket No. 157 (Simon Decl. ¶ 12 & Exs. A-B).  Attorney Bruce Simon and

6  the law firm of Pearson, Simon, Soter, Warshaw & Penny, LLP have litigated a multitude of

7  antitrust class actions, consumer class actions, employee class actions, and securities class actions, a

8  number of which yielded significant results for the clients.  *See* Docket No. 157 (Simon Decl., Ex.

9  A).  In light of the experience of class counsel, their view that the settlement is fair, reasonable, and

10  adequate should be given due consideration.  For the reasons discussed above, their views are not

11  tainted by any conflict of interest with the subclasses.  Furthermore, there is no evidence that their

12  views are tainted because of collusion with Richemont.  Indeed, as discussed above, what evidence

13  there is suggests that there was no collusion as class counsel has litigated the action with "'due

14  diligence and reasonable prudence.'"  *Molski*, 318 F.3d at 956.

15         7.     Reaction of Class Members to Proposed Settlement

16            a.     Consumer Subclass

17        As noted above, 75,122 notices were mailed to members of the consumer subclass and not

18  returned as undeliverable.  In response to the notices, only 8 members asked for exclusion from the

19  subclass (*i.e.*, less than 1%) and only 9 members voiced objections (*i.e.*, less than 1%).  In short, the

20  vast majority of the members (*i.e.*, more than 99.9%) were amenable to the settlement.

21        The Court has considered the objections that were made.  The Court took these objections

22  into account in requesting the Settling Parties to consider changing the terms of the consumer

23  settlement to allow limited aggregation of credits.  The Court is not persuaded that the settlement

24  needs to be further altered in order to be fair and adequate.  For example:

25  •     Several members objected to the initial settlement because it did not allow for the

26         aggregation of credits.  Now, however, Richemont has agreed to aggregation up to a

27         maximum of two credits.  *See* Docket No. 258 (letter, filed on 5/9/2007).

28

United States District Court

For the Northern District of California

- Several members indicated that they wanted cash instead of a credit because $100 is an insignificant amount given that Cartier products are at issue. But, as noted above, there is a fair number of items that may be purchased at Richemont-owned Cartier boutiques that cost less than $100, and even more that cost between $100 and $250. With the possibility of aggregating two credits, items of significant value may be purchased in their entirety and others costing several hundred dollars would be available at a net substantial discount.

- Several members complained that the attorney's fees are excessive, but the settlement simply provides that Richemont agrees to pay up to $2 million. Ultimately, it is the Court's decision as to what constitutes a reasonable fee.

- One member objected that notice was inadequate. But due process requires only "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). Here, notice was reasonably calculated. Consistent with Federal Rule of Civil Procedure 23(c)(2)(B), individual notice by mail was sent to all members would could be identified through reasonable effort. *See* Fed. R. Civ. P. 23(c)(2)(B). Richemont maintained records of past Cartier watch repairs and so was able to generate a list of the members of the consumer subclass (85,957 persons total). Notice could not be sent to all of these persons, but not due to any fault by the Settling Parties. Approximately 4,500 of the names on the list did not have a corresponding last known address, and approximately 6,300 notices were mailed but returned as undeliverable and without any forwarding information. The objecting member asserted that supplemental notice by publication should have been issued to cover these individuals. But "[i]Individual mailings, even when only calculated to reach one third of prospective plaintiffs, and even without supplemental publication in newspapers, has been found to constitute adequate notice." *Gonzalez v. City of New York*, 396 F. Supp. 2d 411, 418 (S.D.N.Y. 2005); *see also Grunin v. International House of Pancakes*, 513 F.2d 114, 12(8th Cir. 1975) (concluding that additional "notice by publication was unnecessary in this

United States District Court

For the Northern District of California

1    case for due process purposes and probably would have been of little value in alerting

2    members of the class and subclass that were previously uninformed").

3  • One member objected that a consumer should be able to provide proof of the number of

4    qualifying repair services that he or she paid for rather than relying on Richemont's records.

5    But there is nothing to indicate that Richemont's records are not reasonably reliable.

6    Furthermore, it is likely that many consumers would not have maintained records regarding

7    the number of repairs.

8  • One member complained that there is no relationship between the actual damages suffered

9    by a consumer and the amount of benefits under the settlement. This is not accurate. A

10   consumer is entitled to a $100 credit for *each* qualifying repair service.

11                 b.    Watchmaker Subclass

12       In response to the publication notice and supplemental notice, 106 members validly opted

13  out from the subclass and 3 members formally objected. Also, as noted above, GCG received

14  communications from watchmakers who were *not* covered by the Court's order of May 19, 2008,

15  which required supplemental notice to be sent to certain members of the watchmaker subclass. *See*

16  Docket No. 273 (Horn Decl. ¶¶ 14-16). Excluding (1) those watchmakers who are not part of the

17  class because they are located outside the United States, (2) Willis and Shirley Lynes who are not

18  watchmakers, *see* Docket No. 257 (order, filed on 5/9/2008, at 3 n.1), and (3) James Sadilek who has

19  already been accounted for as an objector, there were "30 people who had never communicated with

20  CGC before and who therefore were not sent a copy of the Supplemental Notice, but who sent GCG

21  an e-mail stating that they wished to opt-out of the Proposed Settlement." Docket No. 273 (Horn

22  Decl. ¶ 15). Taking into account these 30 people, as well as the 106 valid opt-outs[23] and 3 objectors,

23  and accepting, for purposes of this order, Andre Fleury's estimate that there are approximately 1,500

24  members in the watchmaker subclass, approximately 9% of the subclass has objected, opted out, or

25  otherwise expressed dissatisfaction with the settlement. Thus, the vast majority of members are

26

27  _____

     [23] The Court notes that, of the potential objectors in the Fleury submission who were given the
28  supplemental notice and an opportunity to clarify their intent, only 60 chose to opt out. *See* Part I.D.2, *supra*.

amenable to the settlement. *See Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from only 16 percent of the class was persuasive that the settlement was adequate; adding that "[a] settlement is not unfair simply because a large number or a certain percentage of class members oppose it, as long as it is otherwise fair, adequate, and reasonable" because "[t]o hold otherwise would put too much power in the hands of a few persons having no right to a preferred position in settlement, to thwart a result that might be in the best interests of the class").

As above, the Court has considered the objections that were made but none persuade the Court that the settlement should be further altered. For example:

• Several members complained that the evaluation form that Richemont will use to assess whether a watchmaker is qualified is too subjective. But, as noted by the Court above, there is a legitimate reason for those subjective factors; more important, Richemont's discretion in determining whether a watchmaker is qualified is subject to the covenant of good faith and fair dealing, a breach of which may involve the Court.

• Another member complained that the scope of the release is too broad, but the Court has reviewed the language of the release and finds it appropriate. The Court notes that the Settling Parties have provided clarification that the release is simply limited to claims that were or could have been asserted based on the facts alleged in the second amended complaint. *See* Docket No. 267 (order, filed on 5/19/2008). Hence the scenarios raised by Sacha Fleury (*e.g.*, false or misleading advertising related to the pricing of Cartier watch repairs, false or fraudulent billing practices) are inapposite. *See* Docket No. 249 (objections, filed on 4/24/2008).

• A member argued that it is unfair to impose an opt-out deadline that is simultaneous with the deadline to file objections because "those who oppose the settlement are forced to cho[o]se one or the other." Docket No. 249 (Sacha Fleury Obj. at 16). According to the member, "[t]he court should first entertain objections to the settlement and then, after ruling on the objections, schedule a deadline to opt in or out of the settlement." *Id.* That process, however, would prolong the process and impose significant additional costs. Furthermore, it

United States District Court

For the Northern District of California

1    is a common practice for there to be simultaneous notice of class certification and settlement.

2    *See* Manual for Complex Litigation § 21.311, at 288, 321-22 (4th ed. 2004).  Finally, the

3    objection is largely moot since in this case the Court has given (1) the watchmakers who

4    previously made timely and clear requests to GCG to opt out an opportunity to opt back in

5    and (2) certain watchmakers who allegedly but not clearly opted out the opportunity to

6    confirm that they wished to opt out, with the knowledge that the Court was intending to

7    approve the final settlement.

8       8.    <u>Summary</u>

9       As should be clear from the analysis above, the majority of the factors weigh in favor of

10   approval of the settlement proposed by the Settling Parties.  The bottom line is that the settlement

11   value, although not great, is not without any worth, particularly since Richemont has agreed to

12   expand its network of authorized dealers/repair shops which is a benefit to both consumer and

13   watchmaker alike.  The limited value of the settlement is appropriate in light of the significant

14   litigation risks attendant to Plaintiffs' case.  *See, e.g.*, *Dunleavy v. Nadler (In re Mego Fin. Corp.*

15   *Sec. Litig.)*, 213 F.3d 454, 459 (9th Cir. 2000) ("'It is well-settled law that a cash settlement

16   amounting to only a fraction of the potential recovery does not per se render the settlement

17   inadequate or unfair.' . . . [T]he Settlement amount of almost $ 2 million was roughly one-sixth of

18   the potential recovery, which, given the difficulties in proving the case, is fair and adequate.");

19   *Yeagley v. Wells Fargo & Co.*, No. C 05-03403 CRB, 2008 U.S. Dist. LEXIS 5040, at *8 (N.D. Cal.

20   Jan. 18, 2008) ("The Court finds that while the settlement offers little of value to the class, plaintiff's

21   case is weak and the class could not do better if the Court rejected the settlement.").  The Court

22   notes that the vast majority of consumers has not objected to nor excluded themselves from the

23   settlement.  Likewise, while the number of independent watchmakers is not clear, accepting Andre

24   Fleury's estimate of 1,500, the large majority of watchmakers has not objected to nor excluded

25   themselves from the settlement.  *See Hanlon*, 150 F.3d at 1027 (stating that "the fact that the

26   overwhelming majority of the class willingly approved the offer and stayed in the class presents at

27   least some objective positive commentary as to its fairness").

28

35

**United States District Court**
For the Northern District of California

1   Accordingly, the Court gives final approval to the settlement as fair, reasonable, and

2   adequate and directs the Settling Parties and their counsel to implement and consummate the

3   Amended Settlement Agreement of November 21, 2007, attached hereto as Exhibit A, as modified

4   by Richemont's agreement for limited aggregation of credits for the consumer subclass, *see* Docket

5   No. 258 (letter, filed on 5/9/2008), and as clarified by the Court's order regarding supplemental

6   notice. *See* Docket No. 267 (order, filed on 5/19/2008).

### III.   CONCLUSION

8   The individual claims and class claims asserted by the Settling Plaintiffs are hereby

9   dismissed on the merits with prejudice. Attorney's fees and costs shall be determined at a later date.

10   The Court approves the opt-out list attached hereto as Exhibit B and determines that the opt-

11   out list is a complete list of all settlement subclass members who have properly requested exclusion

12   from the settlement subclasses and accordingly shall neither share in nor be bound by the final order

13   and judgment and are not members of the final settlement class.

14   Without affecting the finality of the final order and judgment for purposes of appeal, the

15   Court reserves jurisdiction over Richemont, the Settling Plaintiffs, and members of the final

16   settlement subclasses as to all matters relating to the administration, consummation, enforcement,

17   and interpretation as to the terms of the amended settlement agreement and final order and judgment,

18   and for any other necessary purpose.

19   The Settling Parties shall monitor the number of $100 credits that are actually used by the

20   members of the consumer subclass (or others to whom they have transferred the credits). In

21   addition, the Settling Parties shall monitor the number of watchmakers who apply to become part of

22   Richemont's authorized network and the number of watchmaker applicants who are ultimately

23   deemed qualified by Richemont. For the two-year period after final approval, the Settling Parties

24   shall file a report with the Court providing the above information. The first report shall be filed

25   within three months after final approval and the second report within six months after final approval.

26   Thereafter, the Settling Parties' report shall be filed every six months.

27   In the event that the settlement does not become effective in accordance with the terms of the

28   Amended Settlement Agreement, then the Amended Settlement Agreement, the final order and

1    judgment, and other terms herein including the certification of the settlement subclasses shall be

2    rendered null and void and be vacated.

3         Absent a Court order, the parties shall remain bound by the confidentiality obligations

4    imposed by the stipulated protective order entered on August 29, 2006, even after termination of this

5    litigation.

6         This order disposes of Docket No. 226.

7

8         IT IS SO ORDERED.

9

10   Dated:  July 3, 2008

11   _____

12   EDWARD M. CHEN
     United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California