UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRE FLEURY, *et al.*, | No. C-05-4525 EMC |
| Plaintiffs, | |
| v. | **ORDER RE SETTLING PLAINTIFFS' MOTION FOR APPEAL BOND** |
| RICHEMONT NORTH AMERICA, INC., | **(Docket No. 296)** |
| Defendant. | |
| _____/ | |

Currently pending before the Court is Settling Plaintiffs'[1] motion for appeal bond. *See* Docket No. 296. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel and all other evidence of record, the Court hereby **GRANTS** the motion and orders objector Mary Meyer to post a bond in the amount of $5,000.

## I. FACTUAL & PROCEDURAL BACKGROUND

The instant case is a class action. As alleged in the second amended complaint, Richemont is a company in the business of selling, maintaining, and repairing high-end watches throughout the United States, as well as selling replacement parts for such watches. Richemont manufactures, markets, sells, and distributes its watches under the brand name Cartier. *See* Docket No. 145 (SAC ¶ 11). On or about January 1, 2003, "[Richemont] advised all watchmakers, and other resellers of Cartier watches and service, that service on Cartier watches would 'only be available to consumers through Cartier Retail Boutiques, authorized Cartier watch dealers, and directly with Cartier After

---

[1] Settling Plaintiffs are Mike Mertaban, Dennis Warner, Charles Cleves, and Liz Hart.

Sales Service Department.'"[2] *Id.* (SAC ¶ 32). According to the complaint, through this policy and "other anticompetitive practices, [Richemont] has conditioned, and is conditioning, the sale of parts for their watches (the 'tying product') to the consumer's purchase of service, maintenance and repair for such watches from [Richemont] (the 'tied product')." *Id.* (SAC ¶ 38).

As alleged in the complaint, Richemont's illegal tying arrangement has harmed two classes of people: (1) independent watchmakers (*i.e.*, not authorized Cartier watch dealers or repair shops) who were "deprived of the right to purchase Cartier parts for the maintenance, service and repair of Cartier watches, as well as not being able to perform said maintenance, service and repair," *id.* (SAC ¶ 12(a)), and (2) "owners of Cartier watches who have been forced to purchase watch repair and maintenance services from [Richemont] . . . and [who] have been deprived of the cost savings and convenience of equivalent services offered by the [independent] watchmaker[s]." *Id.* (SAC ¶ 12(b)). Ms. Meyer is a member of the consumer subclass.

On November 28, 2007, the Court granted the joint motion for preliminary approval filed by Settling Plaintiffs and Richemont. *See* Docket No. 200 (Order). In the order, the Court conditionally certified for settlement purposes both the consumer subclass and the watchmaker subclass. Thereafter, notice of certification and the settlement was sent to members of the watchmaker and consumer subclasses.

Subsequently, objections to the settlement were filed with the Court, both by members of the watchmaker subclass and members of the consumer subclass. Ms. Meyer, a member of the consumer subclass, timely filed her objections on March 17, 2008. *See* Docket No. 220 (Objections).

Settling Plaintiffs and Richemont then moved for final approval of the settlement. *See* Docket No. 226 (Mot., filed on 4/2/08). In their motion, the Settling Parties addressed the objections that had been made, including those by Ms. Meyer. After considering all of the papers that had been submitted, both by the parties in the lawsuit and the members of the subclasses and after the Settling

---

[2] Richemont disputes that this was a new policy. It claims that, "[s]ince at least 1987, [it] has consistently maintained a policy of refusing to sell watch parts to unauthorized dealers for use in servicing Cartier watches." Docket No. 181 (2d Jacquenoud Decl. ¶ 12).

Parties agreed to certain changes and clarifications to the Settlement Agreement, the Court granted final approval. *See* Docket No. 278 (Order, filed on 7/3/2008).

In the order granting final approval, the Court first explained why certification of the subclasses was appropriate. The Court then evaluated the settlement to determine whether it was fair, adequate, and reasonable. In concluding that the settlement was such, the Court acknowledged that the value of the settlement was not great. However, it rejected the contention that it was "without any worth, particularly since Richemont has agreed to expand its network of authorized dealers/repair shops which is a benefit to both consumer and watchmaker alike." Docket No. 278 (Order at 35). The Court also noted that "[t]he limited value of the settlement is appropriate in light of the significant litigation risks attendant to Plaintiffs' case." Docket No. 278 (Order at 35). Most notably, there were significant litigation risks because of the weaknesses in Plaintiffs' claim of illegal tying. The Court emphasized that the facts in the instant case were materially different from those in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).

> The allegations made by Plaintiffs in the instant case bear some surface similarity to those made by the plaintiffs in *Kodak*. But the critical question is whether, in the instant case, consumers were forced to switch to service provided by *Richemont* rather than service provided by independent watchmakers -- just as the customers in *Kodak* were forced to switch to service provided by Kodak instead of service provided by ISOs. There is no real dispute that (as revealed by discovery) there are approximately 50 watch repair shops that are independent of Richemont and that provide Cartier watch repair and service, as well as parts. *See* Docket No. 184 (Settling Pls.' Supp. Br. at 8). There is no evidence that Richemont has a direct economic interest in the sale of Cartier watch repair service by these independent watchmakers who are part of the authorized network. Thus, while under the challenged policy it appears that parts for repairs are available through the authorized Cartier network, a significant part of that network are *economically independent* of Richemont. This fact distinguishes the instant case from *Kodak*. Plaintiff would have to extend *Kodak* to the facts of this case in order to prevail on liability. What little case law there is in this area appears problematic. *See Sports Racing Servs. v. Sports Car Club of Am.*, 131 F.3d 874, 887-88 (10th Cir. 1997) (noting that "[a]n illegal tie may be found where the seller of the tying product does not itself sell the tied product but merely requires the purchaser of the tying product to buy the tied product from a designated third party rather than from any other competitive source that the buyer might prefer" but adding that, "where a third party is involved in selling the tied product to the plaintiff, most courts have required that the tying product seller have a direct economic interest in the sale of the tied product before an illegal tying arrangement will be found"); *Robert's Waikiki U-Drive, Inc. v.*

3

1  *Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1407-08 (9th Cir. 1984)
2  (holding no illegal tying arrangement where airline offered discount
   air fares -- the tying product -- only if the customer purchased car
3  rental services from a designated third party because there was no
   showing the airline had an adequate economic interest in the car
4  rentals); *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476,
   1479-81 (9th Cir. 1983) (examining whether seller of tying product
5  had an economic interest in the tied product sold by a third party).

6  Docket No. 278 (Order at 25-26).

7       The Court also addressed, in its order granting final approval, the various objections that had

8  been made by the members of the subclasses, including each of those made by Ms. Meyer:

9       (1)  *Adequacy of notice to consumer subclass.*  Ms. Meyer objected that the notice to the

10 consumer subclass was inadequate.  The Court had determined that mail notice was appropriate; Ms.

11 Meyer contended that there should have been both mail notice, plus publication notice.  *See* Docket

12 No. 220 (Objections at 2) ("This is because of returned mail, incorrect addresses and a whole host of

13 other issues.").  The Court rejected Ms. Meyer's objection because "due process requires only

14 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the

15 pendency of the action and afford them an opportunity to present their objections,' [and], [h]ere,

16 notice was reasonably calculated."  Docket No. 278 (Order at 32).

17      The Court noted that,

18      [c]onsistent with Federal Rule of Civil Procedure 23(c)(2)(B),
        individual notice by mail was sent to all members would could be
19      identified through reasonable effort.  Richemont maintained records of
        past Cartier watch repairs and so was able to generate a list of the
20      members of the consumer subclass (85,957 persons total).  Notice
        could not be sent to all of these persons, but not due to any fault by the
21      Settling Parties.  Approximately 4,500 of the names on the list did not
        have a corresponding last known address, and approximately 6,300
22      notices were mailed but returned as undeliverable and without any
        forwarding information.
23

24 Docket No. 278 (Order at 32). While Ms. Meyer contended that publication notice should have been

25 issued to cover these individuals, the Court noted that "'[i]ndividual mailings, even when only

26 calculated to reach one third of prospective plaintiffs, and even without supplemental publication in

27 newspapers, has been found to constitute adequate notice.'"  Docket No. 278 (Order at 32) (quoting

28 *Gonzalez v. City of New York*, 396 F. Supp. 2d 411, 418 (S.D. N.Y. 2005)*; also citing Grunin v.*

*International House of Pancakes*, 513 F.2d 114, 12 (8th Cir. 1975) (concluding that additional "notice by publication was unnecessary in this case for due process purposes and probably would have been of little value in alerting members of the class and subclass that were previously uninformed")).

In her opposition to the pending motion, Ms. Meyer cites several cases to support her argument that mail notice should have been supplemented with publication notice. *See* Opp'n at 2. However, those cases distinguishable. For example, in *In re Agent Orange Product Liability Litigation*, 818 F.2d 145 (2d Cir. 1982), the trial court did require publication notice in addition to mail notice -- and the Second Circuit agreed that this satisfied due process -- but this decision was informed by the fact that only a small percentage of the total number of servicemen who had been exposed to agent orange could be identified. *See id.* at 169 ("Chief Judge Weinstein found that many of the members of the class were unknown and could not be located through reasonable efforts."). In *Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982), the Second Circuit upheld the trial court's order requiring both mail and publication notice but the court did not suggest that mail notice alone would have been insufficient. In fact, the court cited approvingly the *Grunin* case, which, as noted above, approved mail notice without publication notice, despite evidence that one third of the prospective class did not receive notices. *See id.* at 71. In *In re Portal Software, Inc.*, No. C-03-5138 VRW, 2007 WL 1991529 (N.D. Cal. June 30, 2007), the trial court concluded that mail plus publication notice was the best notice practicable under the circumstances but did not explain why. Moreover, the court cited the Manual for Complex Litigation for the proposition that "'[p]ublication in magazines, newspapers, or trade journals may be necessary *if class members are not identifiable after reasonable effort*.'" *Id.* at *7 (emphasis added).

(2)   *Adequacy of Richemont's records.*  Ms. Meyer also objected on the basis that a member of the consumer subclass should be able to provide proof of the number of qualifying repair services that he or she paid for rather than relying on Richemont's records. The Court rejected this objection because "there is nothing to indicate that Richemont's records are not reasonably reliable. Furthermore, it is likely that many consumers would not have maintained records regarding the

5

number of repairs." Docket No. 278 (Order at 32-33). Ms. Meyer failed to produce any evidence to the contrary.

(3) *Relationship between damages suffered and benefit received.* Ms. Meyer further objected on the ground that "there is no relationship between each consumer settlement class members' actual damages and the amount of benefits under this settlement." Docket No. 220 (Objections at 3). In response, the Court stated that this was not accurate as "[a] consumer is entitled to a $100 credit for *each* qualifying repair service." Docket No. 278 (Order at 33) (emphasis in original). Ms. Meyer contended that there was no relationship because "[e]veryone gets the same $100 credit per qualifying paid repair service, regardless of the underlying cost." Docket No. 220 (Objections at 3). Presumably, costs of repair did vary from individual to individual, depending on the repair that was needed. However, no evidence was ever presented that repair costs differed so dramatically that the consumer subclass should be divided into further subclasses.

(4) *Stacking of credits.* In her objections, Ms. Meyer also contended that a consumer should be allowed to aggregate his or her credits to purchase a Cartier product, rather than being restricted to use of one credit per product. Other members of the consumer subclass voiced the same objection. *See* Docket Nos. 209, 213 (Objections). At the hearing on the joint motion for final approval, the Court asked Richemont whether it would agree to at least a limited aggregation or "stacking" of credits. Richemont agreed to aggregation up to a maximum of two credits. *See* Docket No. 278 (Order at 7). Thus, Ms. Meyer obtained at least part of the relief she sought. Ms. Meyer contends that she "sees no legitimate reason why the aggregation of coupons could not have been unlimited. The number of coupons is finite and aggregation or stacking makes the coupons more valuable." Opp'n at 2. Undoubtedly, unlimited aggregation would make the credits more valuable since they could be traded and accumulated for larger purchases. However, the issue for the Court was whether the settlement for the consumer subclass (as well as the watchmaker subclass) was fair, reasonable, and adequate. Given the weaknesses in Plaintiffs' tying case, the Court was satisfied that the benefit of limited (as opposed to unlimited) aggregation constituted adequate consideration.

(5)  *Conflict between subclasses.*  Ms. Meyer objected on the additional ground that there was a conflict between the consumer and watchmaker subclasses, such that separate counsel should have represented each.  Although Ms. Meyer did not specify in her objections why there was a conflict, the Court discussed the issue based on the reason articulated by another objector.  The Court stated:

> According to Sacha Fleury, there is a conflict between the subclasses because recovery for one subclass (*i.e.*, the consumers) dilutes recovery for the other subclass (*i.e.*, the watchmakers), *see* Docket No. 249 (Sacha Fleury's Obj. at 12) (asserting that "the settlement coupons to be given to consumers reflect a diversion of funds from the watchmakers, who received nothing from Cartier for their business losses").  However, under the settlement, both the consumers and the watchmakers are given benefits.  The fact that the benefits for the consumers are different from the benefits for the watchmakers does not mean, therefore, that funds were diverted from the watchmaker subclass to the consumer subclass.  There is nothing to indicate that the settlement terms of one subclass came at the expense of the other.

Docket No. 278 (Order at 22).  *See Torrisi v. Tuscon Elec. Power Co.*, 8 F.3d 1370, 1373, 1378 (9th Cir. 1993) (Despite argument that differences in recovery between subclasses created conflicts of interest, court of appeals found that subclasses were not entitled to separate legal counsel in securities class action).

(6)  *Amount of fee award.*  Finally, Ms. Meyer objected that the attorney's fees for settlement class counsel were excessive, whether under the percentage or lodestar method.  The Court rejected this objection because "the settlement simply provides that Richemont agrees to pay up to $2 million.  Ultimately, it is the Court's decision as to what constitutes a reasonable fee."  Docket No. 278 (Order at 32).  Importantly, this objection was even filed before the Court ruled on the fee motion.  Ms. Meyer claims that "[t]he Court has ruled that under CAFA, a percentage of recovery analysis [for attorney's fees] is not allowed in a coupon settlement."  Opp'n at 4.  This is incorrect.  The Court has noted that CAFA does allow for an award of fees based on the lodestar method, *see* Docket No. 295 (Order at 3) (citing *Perez v. Asurion Corp.*, No. 06-20734-CIV-SEITZ /MCALILEY, 2007 U.S. Dist. LEXIS 66931, at *4-5 (S.D. Fla. Aug. 8, 2007) (stating that a court has discretion to award fees based on the lodestar method under the Class Action Fairness Act)), but it has never held that the percentage method is necessarily inappropriate.  In fact, CAFA provides

that, "[i]f a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a) (2008). In the instant case, the fee awarded was in fact based on the lodestar method. *See* Docket No. 295 (Order at 6).

## II. THE MOTION

After the Court granted final approval to the settlement, Ms. Meyer filed her notice of appeal. *See* Docket No. 286 (Notice, filed on 7/23/2008). In response, Settling Plaintiffs filed the instant motion, asking that Ms. Meyer be ordered to post a cost bond pursuant to Federal Rules of Appellate Procedure 7 and 39. Settling Plaintiffs requested that Ms. Meyer be required to post an appeal bond in the amount of $380,644.88, representing in large part their calculation of the costs (time - value of money) of delay in implementing the Settlement Agreement. *See* Mot. at 12. Richemont subsequently joined the motion. *See* Docket No. 307 (Joinder, filed on 8/27/08).

## III. DISCUSSION

A.  Legal Standard

Federal Rule of Appellate Procedure 7 provides in relevant part that, "[i]n a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Fed. R. App. P. 7. As reflected in this language, the purpose of the rule is to "protect[] . . . an appellee against the risk of nonpayment by an unsuccessful appellant." *In re AOL Time Warner, Inc.*, No. 1500, 02 Cv. 5575 (SWK), 2007 U.S. Dist. LEXIS 69510, at *4 (S.D.N.Y. Sept. 20, 2007); *see also Page v. A. H. Robins Co.*, 85 F.R.D. 139, 139-40 (E.D. Va. 1980) ("[T]he purpose[] of an appeal bond is to provide an appellee security for the payment of such costs as may be awarded to him in the event that the appellant is unsuccessful in his appeal."). The advisory committee notes to Rule 7 indicate that the question of the need for a bond, as well as its amount, are left in the discretion of the trial court. *See* Fed. R. App. 7, 1979 advisory committee notes. None of the parties dispute that this Court is vested with such discretion.

B.  Need for Bond

Rule 7 does not provide explicit guidance as to what factors a court should consider in determining whether to require a bond. The Ninth Circuit has indicated that because of due process concerns, the appellant's financial ability to post a bond is an appropriate consideration. *See Azizian v. Federated Department Stores, Inc.*, 499 F.3d 960, 961 (9th Cir. 2007) (noting that some factors, such as financial hardship, might indicate that a bond would unduly burden a party's right to appeal). While the Ninth Circuit has not provided more specific guidance, other courts have held that factors such as the following should be taken into account: (1) the appellant's financial ability to post a bond; (2) the risk that the appellant would not pay the appellee's costs if the appeal loses; (3) the merits of the appeal; and (4) whether the appellant has shown bad faith or vexatious conduct. *See RBFC ONE, LLC v. Timberlake*, No. 02 Civ. 3231 (DFE), 2005 U.S. Dist. LEXIS 19148, at *3-4 (S.D.N.Y. Sept. 1, 2005); *Tri-Star Pictures, Inc. v. Unger*, 32 F. Supp. 2d 144, 147-149 (S.D.N.Y. 1999).

The Court finds consideration of the first three factors accords with the purpose of Rule 7 and the Ninth Circuit's opinion in *Azizian*. The purpose of a "Rule 7 bond is designed to protect 'the amount the appellee stands to have reimbursed,' not to impose an independent penalty on the appellant." *Capizzi v. States Res. Corp.*, Nos. 02-12319-DPW, 04-10095-DPW, 2005 U.S. Dist. LEXIS 7338, at *4 (D. Mass. Apr. 26, 2005). The first two factors protects the appellee "against the risk of non payment by an unsuccessful appellant." *In re AOL Time Warner*, *supra*, at *4. As to the third factor, the merits of the appeal informs the likelihood that the appellant will lose and thus be liable for costs. *See Adsani v. Miller*, 139 F.3d 67, 79 (2nd Cir. 1998).

As to the fourth factor, the Ninth Circuit's decision in *Azizian v. Federated Department Stores, Inc.*, 499 F.3d at 960, forecloses this Court from considering the frivolity or bad faith of the appeal. In *Azizian*, the Ninth Circuit noted that, pursuant to Federal Rule of Appellate Procedure 38, an appellee can be awarded damages and single or double costs if the appellate court were to determine that the appeal was frivolous. *See* Fed. R. App. P. 38 ("If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee").

But the court expressly held that "a district court may not include in a Rule 7 bond appellate attorney's fees that might be awarded by the court of appeals if that court holds that the appeal is frivolous under Federal Rule of Appellate Procedure 38." *Azizian*, 499 F.3d at 954. In so holding, the Ninth Circuit indicated that Rule 7 is not intended to provide a penalty to address the frivolity of an appeal. *See id.* at 960 ("Rule 38 authorizes an award of appellate attorney's fees not simply as incident to a party's successful appellate defense or challenge of a judgment below, but rather as a sanction for improper conduct on appeal."). The Ninth Circuit also stated that "whether, or how, to deter frivolous appeals is best left to the courts of appeal." *Id.* at 961.

The Court therefore bases its analysis of whether a bond is necessary on the following considerations: (1) Ms. Meyer's financial ability to post a bond, (2) the risk that she would not pay the costs if the appeal loses, and (3) an assessment of the likelihood that Ms. Meyer will lose her appeal and be subject to costs.

With respect to the first factor, Ms. Meyer has submitted no financial information to indicate that she is financially unable to post a bond. Ms. Meyer contends that she would effectively be barred from pursuing her appeal if required to post a bond in the amount sought by Settling Plaintiffs (*i.e.*, $380,644.88). This factor would normally weigh in favor of a bond. *See Chiaverini, Inc. v. Frenchie's Fine Jewelry, Coins & Stamps, Inc*., No. 04-CV-74891-DT, 2008 U.S. Dist. LEXIS 45726, at *7 (E.D. Mich. June 12, 2008) ("There is no indication that plaintiff is financially unable to post bond, and thus this factor weighs in favor of a bond."). However, at the hearing on the pending motion, the Court asked Ms. Meyer what size bond would be appropriate if the Court were to require one. Her counsel responded that one in the range of $1,000 to $5,000 would be appropriate. Ms. Meyer did not contend she could not afford a bond for that amount, an amount the Court deems appropriate, as discussed below. Given the size of the bond which this Court is inclined to impose, the factor is neutral.

As for the second consideration, there is no evidence that Ms. Meyer would not pay Settling Plaintiffs' costs if she were to lose on her appeal. On the other hand, Ms. Meyer is not a resident of California, nor does she reside in a state within the Ninth Circuit, *see* Docket No. 220 (Notice),

which arguably would make it more difficult for the Settling Parties to collect their costs should they prevail on the appeal. This factor weighs in favor of a bond.

Finally, the Court must consider the merits of Ms. Meyer's appeal. As discussed above, the Court has considered each of Ms. Meyer's objections and finds them meritless. The Court finds Ms. Meyer is not likely to succeed on the merits of her appeal.[3] This factor weighs in favor of a bond.

On balance, the relevant factors counsel for the posting of a bond under Fed. R. App. P. 7.

C.   Amount of Bond

Having concluded that a bond is appropriate, the Court now turns to the issue of the amount of the bond. The Ninth Circuit has held that the costs referred to in Rule 7 include those costs identified in Federal Rule of Appellate Procedure 39(e):

> (1)   the preparation and transmission of the record;
>
> (2)   the reporter's transcript, if needed to determine the appeal;
>
> (3)   premiums paid for a supersedeas bond or other bond to preserve rights pending appeal; and
>
> (4)   the fee for filing the notice of appeal.

Fed. R. App. P. 39(e). *See Azizian*, 499 F.3d at 958. However, the Ninth Circuit also held that costs other than those identified in Rule 39 can qualify as "costs" for purposes of Rule 7 if they are so defined by some positive law, such as a fee-shifting statute. *See Azizian*, 499 F.3d at 958 ("[T]he costs identified in Rule 39(e) are among, but not necessarily the only, costs available on appeal [for

---

[3] While the Court reaches no conclusion as to frivolousness and bad faith under *Azizian*, the Court would be hard pressed to say that all of the objections were patently frivolous. To the extent Settling Plaintiffs suggest that the appeal is frivolous because Ms. Meyer lacks standing to pursue her appeal, the Court does not agree. Ms. Meyer has alleged injuries that stem from the Court's order granting final approval of the settlement. *See In re First Cap. Holdings Corp. Fin. Prods. Secs. Litig.*, 33 F.3d 29, 30 (9th Cir. 1994); *Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1075 (9th Cir. 2001). In any event, the standing issue is ultimately one for the Ninth Circuit to decide, not this Court. Settling Plaintiffs also suggest the appeal was filed in bad faith. At the hearing. Settling Plaintiffs alleged that Ms. Meyer's appeal is driven by The Bandas Law Firm and point to one appeal by the firm found to be frivolous. *See* Mot. at 9, citing *Conroy v. 3M Corp., et al.*, Case No. C00-2810 CW (N.D. Cal. Aug. 10, 2006) (Judge Wilken found the appeal to be frivolous and imposed an appeal bond). In addition, Settling Plaintiffs point to Ms. Meyer's deposition testimony, which demonstrates her lack of understanding of the basis of the appeal as evidence of her bad faith. *See* Mot. at 5-8, citing Objector Meyer's Deposition Testimony (May 1, 2008). The Court finds this evidence troubling, but in view of *Azizian* makes no finding. (See discussion below.).

purposes of Rule 7]."). For example, "the term 'costs on appeal' in Rule 7 includes all expenses defined as 'costs' by an applicable fee-shifting statute, including attorney's fees." *Id.*

In the instant case, Settling Plaintiffs have not disputed that the costs itemized in (1), (2), and (4) would be at most several thousand dollars. Instead, Settling Plaintiffs argued that the amount of the bond should be "based upon the monetary harm the parties and the class would incur from defending the court's order on appeal and from the delayed implementation of the settlement." Mot. at 11. The Court, however, is not convinced that such damages due to delay ("delay damages") are within the scope of the "costs of appeal" within the meaning of Rule 7.

First, as noted above, the Ninth Circuit held in *Azizian* that F.R.A.P. 7 authorizes a bond only to cover "costs" on appeal as expressly defined by rule or statute. 499 F.3d at 958. *Id.* The Ninth Circuit held the express language of Rule 7 which encompasses only "costs" must be given literal effect. *Id.* at 959. The delay damages sought by Settling Plaintiffs herein are akin to damages, not costs. They have cited no statute or rule defining such delay damages as "costs."

Second, an award of such "delay damages" seems to fall within the purview of 28 U.S.C. § 1912. This statute provides that "[w]here a judgment is affirmed by the Supreme Court or a court of appeals, the court in its discretion may adjudge to the prevailing party just damages for his delay, and single or double costs." 28 U.S.C. § 1912. Section 1912 thus expressly characterizes the delay damages as "damages" as distinct from "costs," and is thus not within the literal scope of Rule 7. Significantly, Section 1912 is frequently cited in tandem with F.R.A.P. 38. Courts have typically awarded costs and attorney's fees as sanctions when (1) the appeal was without merit or the result obvious; and (2) the frivolous appeal was taken in bad faith for purposes of delay or harassment. *See Oliver v. Mercy Medical Ctr., Inc.*, 695 F.2d 379, 382 (9th Cir. 1982), citing Fed. R. App. P. 38; 28 U.S.C. § 1912. The Ninth Circuit has found an appeal which was "pursued for purposes of delay" to be frivolous, and imposed sanctions under F.R.A.P. 38 and 28 U.S.C. § 1912. *U.S. for Use of Ins. Co. Of North Am. v. Santa Fe Engineers, Inc.*, 567 F.2d 860, 861 (9th Cir. 1978). *See also DeWitt v. Western Pac. R. Co.*, 719 F.2d 1448, 1451 (9th Cir. 1983) (sanctions imposed under F.R.A.P. 38 and 28 U.S.C. § 1912 for filing a frivolous appeal); *Arizona Elec. Power Co-op, Inc. v.*

*Berkeley*, 59 F.3d 988, 993-94 (9th Cir. 1995) (same).  As discussed below, *Azizian* held that a Rule 7 bond does not encompass damages and penalties awardable under Rule 38.  499 F.3d at 961.

To be sure, there is some authority supporting Settling Plaintiffs' position.  *See, e.g.*, *Allapattah Servs., Inc. v. Exxon Corp.*, No. 91-0986-CIV, 2006 WL 1132371, at *18 (S.D. Fla. Apr. 7, 2006) (requiring objector to post a bond in the amount of $13.5 million in order "to cover the damages, costs and interest that the entire class will lose as a result of the appeal"); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *1 (D. Me. Oct. 7, 2003) (stating that "damages resulting from delay or disruption of settlement administration caused by a frivolous appeal may be included in a Rule 7 bond").  However, these cases are not persuasive.  They preceded the Ninth Circuit's decision in *Azizian* to which this Court is bound.[4]  *Cf. Livingston v. Toyota Motor Sales USA, Inc.*, Nos. C-94-1377-MHP, C-94-1359 MHP, C-94-1960 MHP, 1997 U.S. Dist. LEXIS 24087, at *10-11 (Nov. 12, 1997) (a pre-*Azizian* case stating that "[t]he real cost here would be the damages suffered by the Class members because of the delays caused by the pendency of this appeal").

Settling Plaintiffs have raised the concern that Ms. Meyer's appeal was filed in bad faith, perhaps in an attempt to extract a settlement out of the Settling Plaintiffs.  They cite an instance (Mot. at 9) where the firm representing Ms. Meyer was found to have filed a frivolous appeal by Judge Wilken of this Court.  *Conroy v. 3M Corp., et al.*, Case No. C00-2810 CW (N.D. Cal. Aug. 10, 2006).  Judge Wilken ordered The Bandas Law Firm, jointly with one objector, to post an appellate cost bond in the amount of $431,167.00.  *See* Docket No. 265 (Order, filed 8/10/2006).  However, imposing a bond under F.R.A.P. 7 is not the proper remedy.  This cost bond was imposed prior to *Azizian*, and would not be proper under F.R.A.P. 7 under *Azizian*.  The Ninth Circuit found that "the question of whether, or how, to deter frivolous appeals is best left to the courts of appeals,

---

[4] Other authorities cited by Settling Plaintiffs are not on point.  For example, in *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007), the court did say that "[a]n appeal bond is not uncommon in these circumstances given the delay and costs which may be incurred by the class by an appeal."  *Id.* at 316.  However, in that order, the court did not require a bond to be posted which covered delay costs.  *See id.* at 251 ("The amount of the appeal bond will be set if, as, and when a notice of appeal is filed.").  In *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812 (6th Cir. 2004), the court did not address the issue of "delay costs" at all, focusing instead on the issue of whether attorney's fees could be considered "costs on appeal" for purposes of Rule 7.

which may dispose of the appeal at the outset through a screening process, grant an appellee's motion to dismiss, or impose sanctions including attorney's fees under Rule 38." *Azizian*, 499 F.3d at 961. The court reasoned that "[a]llowing district courts to impose high Rule 7 bonds on where the appeal *might* be found frivolous risks impermissibly encumbering appellants' right to appeal and effectively preempting this court's prerogative to make its own frivolousness determination. *Id*. (Emphasis in original) (Quotations omitted). "Moreover, a Rule 7 bond including the potentially large and indeterminate amounts awardable under Rule 38 us more likely to chill an appeal than a bond covering the other smaller, and more predictable, costs on appeal." *Id*. at 960.

Significantly, Settling Parties are not left without any recourse if the appeal is frivolous. The amount of the bond set by the district court is subject to review on appeal. *See*, *e.g.*, *Azizian*, 499 F.3d at 955. Also, Settling Parties may move to dismiss or expedite the appeal. *See* 9th Cir. R. 27-3, 27-11, 27-12; *Azizian* 499 F.3d at 961. In addition, Settling Plaintiffs may move the Court of Appeals to impose monetary sanctions against Ms. Meyer *or her counsel*, or both, if this appeal ultimately is found to be frivolous. *See* Fed. R. App. P. 38 (2008); 28 U.S.C. § 1912. *See, e.g., Libby, McNeill & Libby v. City Nat'l Bank*, 592 F.2d 504, 514 (9th Cir. 1978).

Accordingly, the Court shall require a bond pursuant to Rule 7 but shall require Ms. Meyer to post a bond in the amount of $5,000, which should adequately cover the costs of appeal, awardable under F.R.A.P. 39.

### IV. CONCLUSION

For the foregoing reasons, Settling Plaintiffs' motion for an appeal bond is granted. Ms. Meyer shall post a bond in the amount of $5,000 in order to proceed with her appeal.

This order disposes of Docket No. 296.

IT IS SO ORDERED.

Dated: October 21, 2008

_____
EDWARD M. CHEN
United States Magistrate Judge

14