UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRE FLEURY, *et al.*, | No. C-05-4525 EMC |
| Plaintiffs, | |
| v. | **ORDER DENYING SACHA FLEURY'S MOTION FOR ATTORNEY'S FEES AND COSTS** |
| RICHEMONT NORTH AMERICA, INC., | |
| Defendant. | **(Docket No. 287)** |
| _____/ | |

Currently pending before the Court is Sacha Fleury's motion for attorney's fees and costs. The fees and costs sought total $65,510.80. The fees reflect Sacha Fleury's opposition to the settlement and efforts to change aspects of the settlement in favor of the watchmaker subclass. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** the motion in its entirety.

## I. DISCUSSION

A. <u>Standing</u>

The caption for the fee motion indicates that fees are being requested by Sacha Fleury's counsel, Flynn/Williams LLP ("FW"), and not Sacha Fleury himself nor even his father Andre Fleury. Accordingly, in its opposition brief, Richemont argued that FW -- as counsel for the Fleurys and not a party to the litigation -- lacks standing to move for fees. In reply, FW basically conceded that there was an error in the caption and represented that the motion was being made by Sacha Fleury. At the hearing on the motion, FW confirmed that the fee request was being made by Sacha Fleury and specifically disavowed that any fees being were sought on behalf of Andre Fleury.

1    In light of FW's representations that it is actually Sacha Fleury who is requesting fees, and
2 not FW itself, the Court declines to deny fees on the basis of lack of standing. However, as
3 discussed below, the Court concludes that the motion should be denied on other grounds.

4 B.    Timeliness

5    First, the motion is denied on the basis of timeliness. As argued by the Settling Plaintiffs, the
6 fee motion is untimely because, in its order granting preliminary approval (filed on November 28,
7 2007), the Court specified that "[a]ny petition for award of attorneys' fees or reimbursement of
8 litigation costs and expenses shall be filed prior to the Final Approval Hearing."[1] Docket No. 200
9 (Order ¶ 22). The final approval hearing was ultimately held on May 7, 2008. *See* Docket No. 255
10 (civil minutes). No fee motion was made by Sacha Fleury prior to the final approval hearing, and no
11 mention of a fee motion was made by Sacha Fleury at the hearing itself.[2]

12    In response, Sacha Fleury argues that the Court's order is not a bar to his fee motion because
13 (1) the order was issued months before FW became involved in the case and (2) the order "clearly
14 refers to *class counsel's* petition for fees." Reply at 2 (emphasis in original). According to Sacha
15 Fleury, "it is doubtful [that] the Order was intended to apply to objectors, or that class counsel,
16 Richemont, or the Court even considered the possibility of counsel for the objectors." Reply at 2.
17 Neither argument is persuasive. That the order was issued months before FW became involved in
18 the case has little resonance since it is clear that Andre Fleury was participating in the litigation at
19 the time that the order was issued and Sacha Fleury (his son) was therefore likely apprised of what
20 was taking place in the lawsuit. More importantly, once Sacha Fleury stepped into the litigation, his
21 counsel, FW, should have apprised himself of what had taken place in the litigation, and the Court's
22 order granting preliminary approval was part of the public file for FW's review. As for Sacha

---

[1] Federal Rule of Civil Procedure 23(h) provides that a claim for fees "must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), *at a time the court sets*." Fed. R. Civ. P. 23(h)(1) (emphasis added); *see also* Fed. R. Civ. P. 54(d)(2) (stating that a motion must "be filed no later than 14 days after the entry of judgment," that is, "[u]nless a statute or *a court order* provides otherwise") (emphasis added).

[2] There is no dispute that, by the date of the final approval hearing, Sacha Fleury had, through counsel, submitted multiple filings to the Court, including two sets of objections as well as comments as to whether the alleged opt-outs that were part of the Andre Fleury submission should be recognized. *See* Docket Nos. 224, 249, 261, 262.

1  Fleury's contention that the order refers only to class counsel's petition for fees, that is belied by the
2  language of the order itself, which refers to "*any* petition" for fees. Docket No. 200 (Order ¶ 22)
3  (emphasis added). The clear deadline set for filing fee petitions must be applied consistently and
4  across the board. Its purpose was to assure that the fee issues would not be dealt with piecemeal.
5        The timing of Sacha Fleury's petition is material for an additional reason. Sacha Fleury did
6  not file the motion seeking fees until *after* the settlement agreement was finally approved by the
7  Court. At no point during the hearing process, in which the Court considered objections and
8  directed the Settling Parties to consider amendments, did Sacha Fleury suggest he would seek fees.
9  By the time Sacha Fleury's fee motion was filed, the Settlement Agreement had already been
10 finalized and approved. Thus, the Court lost the ability to condition its approval of the settlement
11 upon the Settling Parties agreement to pay Sacha Fleury's fees. Accordingly, this case presents a
12 different procedural posture than those cited by Sacha Fleury where objector fees were found
13 awardable as a term and condition of the Court's approval of the settlement. *See Great Neck Capital*
14 *Appreciation Investment P'ship, LP v. Pricewaterhouse Coopers, LLP*, 212 F.R.D. 400, 417 (E.D.
15 Wis. 2002) (objector's fees awarded when court approved class settlement and affirmed class
16 certification); *Shaw v. Toshiba Info. Sys., Inc.*, 91 F. Supp. 2d 942, 974 (E.D. Tex. 2000) (objectors
17 made a petition for fees prior to final settlement approval and awarded fees as part of settlement
18 approval). Under these circumstances, the Court must ground any fee award on specific legal
19 authority for shifting fees rather than relying upon its residuary powers in assessing the fairness of
20 the settlement.

21 C.    <u>Authority for Fee-Shifting</u>

22       Sacha Fleury has failed to identify for the Court any applicable authority for the fee-shifting
23 he proposes.
24       Federal Rule of Civil Procedure 23(h) provides that, "[i]n a certified class action, the court
25 may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the
26 parties' agreement." Fed. R. Civ. P. 23(h). In the instant case, the Settling Parties made an
27 agreement with respect to a request for fees by the Settling Plaintiffs only. *See* Docket No. 278, Ex.
28 A (Amended Stipulation of Settlement ¶ 5.1) ("Settlement Class Counsel may apply to the Court for

3

an award of attorneys' fees in an amount not to exceed $2,000,000 . . . . Defendant agrees not to contest such application and agrees to pay fees and expenses up to the $2,000,000 amount as awarded by the Court."). Because there was no agreement involving any party with respect to a request for fees by an objector such as Sacha Fleury, the question for the Court is whether fees to an objector are authorized by law.

In supplemental briefing, Sacha Fleury argued that fees are authorized pursuant to (1) the Class Action Fairness Act ("CAFA"), *see* 28 U.S.C. § 1712(b)-(c); (2) Federal Rule of Civil Procedure 23(h); and (3) the common benefit doctrine.

### 1. CAFA

Contrary to what Sacha Fleury argues, the Court may not award him fees pursuant to the CAFA. Even if the Court were to assume that the instant case is a coupon settlement, *see* Docket No. 295 (Order at 4-5) (discussing why the instant case appears to like a coupon settlement), the CAFA provision cited by Sacha Fleury provides for attorney's fees to class counsel only. *See* 28 U.S.C. §§ 1712(b)-(c) (discussing fees "to be paid to class counsel"). Sacha Fleury's attorneys have not been appointed class counsel. He cites no text in CAFA or any cases construing the statute which provide for fees to objectors.

### 2. Rule 23(h)

Likewise, the Court may not award Sacha Fleury fees pursuant to Rule 23(h). The 2003 advisory committee notes for Rule 23(h) do state that, "[i]n some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as . . . attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel." Fed. R. Civ. P. 23(h), 2003 advisory committee notes. However, the notes also emphatically state that Rule 23(h) "does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties." Fed. R. Civ. P. 23(h), 2003 advisory committee notes. Thus, Rule 23(h) provides no independent authority for fees. Sacha Fleury must find an independent basis in substantive law authorizing such fees.

### 3. Common Benefit Doctrine

Finally, Sacha Fleury seeks attorney's fees based on the common fund/common benefit doctrine. Under this doctrine, an objector must have "substantially enhanced the benefits to the class under the settlement, [or] as a matter of law [he is] not entitled to fees." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002). The rationale underlying the doctrine is that "'to allow the [class] to obtain full benefit from the [objector's] efforts without contributing equally to the litigation expenses would be to enrich the [class] unjustly at the [objector's] expense.'" *Hall v. Cole*, 412 U.S. 1, 6 (1973). This rationale suggests that fees can only be assessed against the benefitted class.

As Sacha Fleury argues, the doctrine may be applied even where no monetary fund for the benefit of the class is created. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970) (stating that, "[a]lthough the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved a 'common fund' for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses"); *see also Hall v. Cole*, 412 U.S. 1, 6, 8-9 (1973) (recognizing vitality of common benefit doctrine; stating that, "by vindicating his own right of free speech guaranteed by § 101(a)(2) of Title I of the LMRDA, respondent necessarily rendered a substantial service to his union as an institution and to all of its members"; adding that "reimbursement of respondent's attorneys' fees out of the union treasury simply shifts the costs of litigation to 'the class that has benefitted from them and that would have had to pay them had it brought the suit'"). However, as discussed below, there are limits to the doctrine. *See generally Reiser v. Del Monte Properties Co.*, 605 F.2d 1135, 1139 (9th Cir. 1979) (laying out requirements for application of common benefit doctrine).

First, under the doctrine, fees may be shifted only where the party seeking fees confers a substantial benefit on a class. *See Hall*, 412 U.S at 5 (citing *Mills*, 396 U.S. at 393-94); *Vizcaino*, 290 F.3d at 1052; *Loring v. City of Scottsdale, Ariz.*, 721 F.2d 274, 275 (9th Cir. 1983). Second, the benefit must be conferred on members of an ascertainable class. *See Hall*, 412 U.S. at 5 (citing *MIlls*, 296 U.S. 393-94). Finally, fees must be capable of being "shifted with some exactitude to

those benefitting." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 264 n.39 (1975); *see also Hall*, 412 U.S. at 5 (stating that, under the common benefit doctrine, "'the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among [members of the benefitting class]'") (quoting *Mills*, 296 U.S. at 393-94). "If the relationship [between the defendant and class members] is such that the costs can be spread indirectly to the beneficiaries by imposing them on the defendant, then the relationship permits application of the doctrine." *Smith v. GTE Corp.*, 236 F.3d 1292, 1307 (11th Cir. 2001).

Sacha Fleury has failed to establish all of the elements of the doctrine. First, Sacha Fleury has failed to show that fees are capable of being "shifted with some exactitude to those benefitting." *Alyeska*, 421 U.S. at 264 n.39. In the instant case, the persons allegedly benefitting are the members of the watchmaker subclass, but Sacha Fleury has failed to show that there is some practical way of shifting the cost of fees to all of those members. The watchmakers received no money. What they obtained was a fair opportunity to join Richemont's network of authorized service centers, together with free tools and discounts on parts for those who successfully join the network.

Sacha Fleury's suggestion that Richemont should pay for his fees is not sustainable because Richemont did not receive any benefit based on his actions, *see Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 148 (3d Cir. 1998) (noting that "the logic underlying the common benefit doctrine is restitutionary in nature"), nor is Richemont some sort of proxy for the watchmaker subclass. *Compare Hall*, 412 U.S. at 8-9 (stating that "reimbursement of respondent's attorneys' fees out of the union treasury simply shifts the costs of litigation to 'the class that has benefitted from them and that would have had to pay them had it brought the suit'"). As noted above, the rationale of the common fund/common benefit doctrine suggests that fees should come from the class benefitted by the objector.

Sacha Fleury's contention that his fees could be taken from the fee award given to class counsel is without merit because class counsel is not being paid out of a common fund. Counsel fees were negotiated separately from the settlement of class claims, and the Settlement Agreement provides for an award (to be determined by the Court) which does not affect the benefits conferred upon the class. Moreover, the fees were awarded pursuant to the lodestar method -- *i.e.*, the Court

6

1 awarded class counsel fees based on the number of hours that they worked, not the benefit that they
2 obtained for the class.  Under these circumstances, taking a portion of class counsel's fees would not
3 even indirectly tax the benefitted class.  Mr. Fleury has not identified a logical basis in the common
4 fund/common benefit doctrine for shifting fees to class counsel or defendant under the facts of this
5 case.

6 Second, even if fees could be shifted, Sacha Fleury failed to provide a substantial benefit to
7 the watchmaker subclass, as discussed below.

8 D. Substantial Benefit

9 An award of fees under the common fund/common benefit doctrine lies in the discretion of
10 the district court.  *See Hall*, 412 U.S. at 15 (indicating whether a party is entitled to fees under the
11 common benefit doctrine is an issue left to the court's discretion).  In determining whether an
12 objector has provided a substantial benefit to the class, a court "must scrutinize the benefits
13 conferred from litigation carefully, lest the doctrine overwhelm the American rule that each party is
14 to bear its own litigation costs."  *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 146 (3d Cir.
15 1998); *see also Mills*, 396 U.S. at 396 (indicating that a "'substantial benefit must be something
16 more than technical in its consequence'").  Notably, courts have taken special care in awarding fees
17 to an objector where no monetary benefit has been provided to the class.  *See, e.g.*, *Vincent*, 557 F.2d
18 at 768 n.7 (stating that "the substantial benefit doctrine was devised to permit fee shifting in cases
19 not covered by the common fund doctrine because of the absence of a pecuniary benefit but yet
20 involving interests *of broad public* importance, interests that Congress sought to vindicate at least in
21 part through private litigation") (emphasis added); *Polonski*, 137 F.3d at 147 (stating that "a
22 common benefit is substantial where, by vindicating the important statutory policy at issue, the
23 plaintiff has rendered a 'substantial service' to all members of the class"; adding that "[t]his
24 substantial service is typically one that not only corrects an abuse prejudicial to an essential right,
25 but also impacts the future conduct of the defendant's affairs")

26 In his motion, Sacha Fleury contends that he provided a substantial benefit because (1) his
27 objections resulted in substantive changes to the settlement; (2) his objections ensured that every
28 member of the watchmaker subclass was given proper notice of the terms of the settlement and of

7

the opportunity to stay in or opt out of the settlement; and (3) his objections helped make the settlement hearing a truly adversarial proceeding. For the reasons discussed below, the Court finds each of these arguments unpersuasive.

1. <u>Substantive Changes to Settlement</u>

During the proceedings, the Court required that a supplemental notice be issued to certain members of the watchmaker and consumer subclasses. For the watchmaker subclass, the supplemental notice provided clarification as to three issues: (1) the scope of Richemont's "sole discretion" in deciding whether a watchmaker application is qualified; (2) the scope of the release; and (3) the fact that a watchmaker need not own a retail store in order to become a qualified watchmaker. *See generally* Docket No. 267 (order regarding supplemental notice).

Taking his cue from the supplemental notice, Sacha Fleury contends that his objections produced the following substantive changes to the settlement: (1) limiting Richemont's "sole discretion" in deciding whether a watchmaker applicant is qualified; (2) limiting the scope of the release; and (3) clarifying that a watchmaker need not own a retail store in order to apply to become a qualified watchmaker.

a. <u>Limiting Richemont's "Sole Discretion"</u>

Long before Sacha Fleury appeared in this litigation on March 17, 2008, *see* Docket No. 223 (appearance by FW), the Court dealt with the "sole discretion" issue. In an order filed on October 17, 2007 -- *i.e.*, some five months before Sacha Fleury made an appearance -- the Court asked for supplemental briefing regarding, *inter alia*, why Richemont should retain sole discretion and whether, based on that language, a watchmaker would be barred from arguing that Richemont implemented the evaluation form in bad faith. *See* Docket No. 176 (Order at 1).

Subsequently, on November 28, 2007, the Court issued an order granting preliminary approval to the settlement. As part of that order, the Court instructed that the notice to be sent to the watchmaker subclass include language demonstrating that there was a limit to Richemont's sole discretion. For example, the approved long-form notice stated: "Richemont's decision on whether to approve an application will be final unless there is evidence that, in applying the criteria set out in the Evaluation Form, Richemont breached the covenant of good faith and fair dealing, in which case

the Court may become involved." Docket No. 200 (Ex. A) (Long-Form Notice at 8). The approved short-form (*i.e.*, publication) notice contained the same exact statement. *See* Docket No. 200 (Ex. B) (Publication Notice at 2).

Notably, in his original objections, Sacha Fleury did not even appear to know that there was a limit to Richemont's sole discretion, as provided for in the notices. *See* Docket Nos. 249, 261 (Sacha Fleury's Obj. at 8). His objections did not mention the notices at all and simply quoted the settlement agreement itself which discussed the sole discretion held by Richemont and did not contain any qualifying language.

In his reply brief, Sacha Fleury now acknowledges that the notices contained the above statement and presents a new argument instead -- *i.e.*, that the statement in the notices was ambiguous. To support this contention, Sacha Fleury points out that, after the original notices were sent out, the Court subsequently ordered that there be a supplemental notice to clarify, *inter alia*, the "sole discretion" issue based on the comments from those who objected to or opted out of the settlement. *See* Reply at 4-5; *see also* Docket No. 278 (Order at 13) ("The supplemental notice clarified certain terms of the settlement, more specifically, terms regarding the scope of the release (as being limited to claims which were or would have been asserted based on the facts alleged in the second amended complaint), Richemont's ability to exercise its discretion to reject a watchmaker applicant (as being subject to the covenant of good faith and fair dealing), and treatment of trade watchmaker applicants (permitting watchmakers without their own store front to apply to the network). The Court found such clarification was warranted in view of comments received from those who objected to or opted out of the settlement.").

While the Court did include a statement in the supplemental notice reaffirming the limit to Richemont's sole discretion, this was not because of any ambiguity in the notices. This was simply because, in spite of the language in the notices, at least some members of the watchmaker subclass still expressed concern about Richemont being able to arbitrarily decide who would be considered qualified. Although the Court did not expressly state such in its order, the Court's concern was informed in part by misleading information propagated by Andre Fleury which may have confused

9

some class members.[3] Notably, the supplemental notice said nothing different in substance from the original notices; it simply stated: "Although Richemont will decide in its sole discretion whether a watchmaker meets the criteria set forth in the Evaluation Form, Richemont must do so in a manner consistent with the covenant of good faith and fair dealing, a breach of which may involve the Court." Docket No. 267 (Order at 4).

In short, the supplemental notice provided no additional substantive benefit to members of the subclass. It served to provide additional clarity to inform decisions of class members to support, oppose, or opt out of the settlement, but this does not constitute a "substantial benefit" conferred upon the class. Moreover, even if it did, Sacha Fleury did not cause this benefit to be conferred.

### b. Limiting Scope of Release

Similar to above, long before Sacha Fleury made an appearance in this litigation on March 17, 2008, *see* Docket No. 223 (appearance by FW), the Court dealt with the issue of the scope of the release. The original settlement agreement submitted by the parties (dated September 12, 2007) defined "Released Claims" as all claims "that relate in any way to the conduct of the Released Parties concerning the pricing, distribution or sale of Cartier watch parts, Cartier watch repairs or Cartier watch service . . . that was asserted or could have been asserted *regarding these matters in the Second Amended Complaint*." Docket No. 156 (Ex. 1) (Stipulation of Settlement ¶ 1.16) (emphasis added). The italicized language indicated that the scope of the release was limited to claims that were related to the conduct at issue in the second amended complaint but, because there could be some ambiguity, the Court asked the Settling Parties at the hearing on the joint motion for preliminary approval (held on November 7, 2007), "Why can't it simply be more clearly stated that -- that the released claims include those which, you know, relate to or arise out of the conduct alleged to be unlawful in a second amended complaint?" Simon Decl., Ex. B (Tr. at 10). Class counsel indicated that the scope of the release was not intended to be sweeping. He stated that the release

---

[3] *Cf.* Docket No. 267 (Order at 3) (ordering that supplemental notice be given to premature opt-outs because "it is possible that these watchmakers may not have known that their previous 'opt-outs' (to the extent that there was a clear request for exclusion) were insufficient, because (1) notice to the watchmakers was effected by publication notice, rather than individual notice, and (2) Andre Fleury has been the source of incorrect or misleading information").

was meant to cover claims that had "some nexus [--] whether you use the words 'arising out of,' 'related to' [-- to] the conduct that's really at the core of the second amended complaint." Simon Decl., Ex. B (Tr. at 11). To address the Court's concern, the parties amended the settlement agreement and the amended stipulation of settlement (dated November 21, 2007) defined released claims as all claims "that were asserted or could have been asserted in the Second Amended Complaint relating in any way to any conduct of the Released Parties concerning the distribution or sale of Cartier watch parts, Cartier watch repairs or Cartier watch service." Docket No. 278 (Ex. A) (Am. Stipulation of Settlement ¶ 1.16).

In his objections, Sacha Fleury argued that the language of the amended settlement agreement was overbroad "in that it . . . extends to claims beyond those alleged in the suit." Docket Nos. 249, 261 (Sacha Fleury's Obj. at 9) (providing as examples claims for false or misleading advertising related to the pricing of Cartier watch repairs and claims for false or fraudulent billing practices). But that was not what either the Settling Parties or the Court intended as evidenced by the comments quoted above. *Compare Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (noting that objectors must decide whether to object without knowing what objections may be moot because they have already occurred to the judge). Were any ambiguity as to the scope of the release to arise in the future, the parol evidence rule would not bar consideration of these comments. *See Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37 (1968) (explaining that, even though the rule does prohibit evidence of inconsistent terms, it "does not make inadmissible extrinsic evidence . . . offered to interpret or explain the meaning of the terms of a written agreement" and that "[e]vidence offered to interpret or explain the meaning of the terms of a written agreement is subject to the normal rules of admissibility and construction of instruments, including the rule that the 'test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible'").

To be sure, subsequently, the Court did include as part of the supplemental notice a statement that "[the] release is limited to claims that were, or could have been, asserted based on the facts

1  alleged in the Second Amended Complaint.  Thus, the settlement does not require watchmakers to
2  release any claims that do not arise out of the facts alleged in the class action lawsuit." Docket No.
3  267 (Order at 4).  But this statement did not substantively change the language of the release in the
4  amended settlement agreement.

5      In sum, Sacha Fleury's objections did not result in any material change to the scope of the
6  releases effectuated by the final settlement agreement.  The facts of this case stand in contrast to the
7  revised release negotiated by the objectors in *Great Neck,* 212 F.R.D. at 413, which contributed
8  materially to the proceeding by benefitting the class and assisting the court.  *Cf. Shaw*, 91 F. Supp.
9  2d at 974 (objector conferred benefit on class by negotiating extension of coupon redemption date).
10  Sacha Fleury made no such material contribution here.

11      c.    <u>Clarifying That Watchmaker Must Own Retail Store</u>

12      Finally, Sacha Fleury claims responsibility for clarifying that a watchmaker need not own a
13  retail store in order to be apply to become a qualified watchmaker.  Sacha Fleury filed two sets of
14  objections.  *See* Docket Nos. 224, 249, 261.[4]  It is true that, in his original objections, he did note in
15  passing that the evaluation form was problematic because it "requires a certain storefront appearance
16  (which many watchmakers do not even have)."  Docket No. 224 (Sacha Fleury's Obj. at 4).
17  However, this point was not elaborated on any further, and the main concern seemed to be the
18  subjective element in requiring a storefront to have a certain appearance.  In his second set of
19  objections, Sacha Fleury did not make any reference to the issue at all.

20      Taking into account the above, Sacha Fleury's attempt to claim responsibility for the
21  clarification regarding trade watchmakers is dubious.  The Court's rejection of Sacha Fleury's
22  position, however, ultimately turns on the fact that well *before* Sacha Fleury made an appearance in
23  the litigation, the issue had been raised -- and explained in great detail -- by another objector, James
24  Sadilek.  *See* Docket No. 218 (filed on 2/11/2008) (discussing issue of trade watchmakers for almost
25  a page).  Responsiblity for the clarification is thus attributable to Mr. Sadilek, and not Sacha Fleury.
26  *See Pasparage v. Riverstone Networks, Inc.*, No. 05-17272, 2007 U.S. App. LEXIS 28053, at *3

27
28      [4] Docket Nos. 249 and 261 are public and redacted versions of the same document.

(9th Cir. Nov. 28, 2007) (concluding that "[t]he district court did not err in finding that the hours [objector] claimed were excessive and that [his] objection accomplished essentially the same thing as the three-page letter submitted by the first objector") (internal quotation marks omitted). In short, even if it is assumed that the clarification for those watchmakers who do not have their own storefront conferred a "substantial benefit" on the subclass, Sacha Fleury did not confer that benefit.

### 2. Supplemental Notice

Sacha Fleury argues next that he should be awarded his attorney's fees because his objections ensured that every member of the watchmaker subclass was given proper notice of the terms of the settlement and of the opportunity to stay in or opt out of the settlement. Essentially, Sacha Fleury is claiming that his objections resulted in the supplemental notice that was sent out to the watchmaker subclass. A brief procedural history will be helpful in evaluating this claim.

On April 2, 2008, the Settling Parties filed their joint motion for final approval, and Settling Plaintiffs filed their fee motion. *See* Docket Nos. 226, 231. On April 11, 2008, the Court issued an order asking for supplemental briefing and/or evidence. *See* Docket No. 237. In the order, the Court asked, *inter alia*, that the Settling Parties provide briefing as to whether any persons in addition to those identified by the Settling Parties should be recognized as opt-outs. The Court's clear concern was with respect to the alleged opt-outs that made up the Andre Fleury submission. The Court noted that

> [o]f particular concern . . . is . . . (a) those persons who apparently did not expressly request exclusion from the settlement (as required by the Long-Form Notice) but who simply stated that they rejected the proposed settlement; (b) those persons who failed to provide their addresses and/or telephone numbers (as required by the Long-Form Notice); and (c) those persons who failed to include the case name and number (as required by the Long-Form Notice).

Docket No. 237 (Order at 2).

On April 18, 2008, the Settling Parties provided their supplemental briefs. Richemont took a hard line position, arguing that the vast majority of the alleged opt-outs should not be recognized. *See* Docket No. 242. Settling Plaintiffs, however, took a more liberal approach. They noted that

> the right to opt out is an individual one which should not be made [by] the class representative or class counsel, [and so] it logically follows that the Settling Plaintiffs and Settlement Class Counsel should not

13

> take a position that may be inconsistent with the opt-out intentions of class members, regardless of whether they communicated through plaintiff Fleury, directly to the Court and/or Settlement Administrator. Moreover, taking a position other than neutrality on the validity of particular communications would potentially place Settlement Class Counsel in an adversarial position with certain members of the class.
>
> . . . .
>
> Regarding the documents submitted by plaintiff Fleury to the Settlement Administrator, Settlement Class Counsel believe that an appropriate course may be for the Settlement Administrator to contact the affected individuals directly and ascertain whether a request for exclusion was intended. This can be accomplished by telephone, email, and/or mail, depending on what contact information has been supplied by the individual. Such remedial measures are within this Court's discretion because the Court has "ultimate control over communications" with the Class. This procedure would be appropriate because there are questions about both the intentions of the class members and the genesis of those intentions. Here, many of the documents submitted through Fleury's website or emails adopt the ambiguous "I have to reject this Proposal" language authored by Fleury. Even the submissions that use the words "opt out," raise concerns because they appear to be based on Fleury's communications and solicitations rather than the official Court-approved Notice. Indeed, some of the submissions are dated before Notice was disseminated. And a few reflect no position on the Settlement whatsoever and merely provide a contact information. Furthermore, it appears that members of the Settlement Class may have been misled and were confused when they communicated with Fleury. One glaring example is the often repeated statement that the class member wishes to be "represented by Mr. Fleury's attorney." Yet, between August 27, 2007 and March 17, 2008 when the vast majority of these communications occurred, Fleury had no counsel of record. For these reasons, the Court may wish to consider using the Settlement Administrator to clarify the intention of the individuals who communicated through Fleury.

Docket No. 242 (Settling Pls.' Supp. Br. at 2-4).

Although the Court asked only for supplemental briefing from the Settling Parties, Sacha Fleury provided a supplemental brief of his own on April 24, 2008. *See* Docket Nos. 250, 262. In the brief, Sacha Fleury argued that all of the alleged opt-outs in the Andre Fleury submission should be recognized as valid. He did not endorse, as an alternative, Settling Plaintiffs' suggestion that, in effect, a supplemental notice be issued.

As should be evident from the history above, Sacha Fleury's objections did not lead to issuance of the supplemental notice. It was his position that all alleged opt-outs should be

1  recognized as valid, period. Settling Plaintiffs, not Sacha Fleury, were the moving force behind the
2  supplemental notice.
3      The Court acknowledges that, after it decided to order a supplemental notice, Sacha Fleury
4  arguably made one contribution with respect to the supplemental notice -- *i.e.*, he asked the Court to
5  reconsider its position that the supplemental notice need not be sent to the premature opt-outs
6  (approximately 50 individuals). *See* Docket No. 265 (Sacha Fleury's Comments at 4). The Court
7  subsequently held that

> it shall now require that the supplemental notice be sent to the
> "premature opt-outs" -- *i.e.*, any watchmaker who was part of the
> Fleury submission and who submitted a communication to Andre
> Fleury, stating that he or she rejected the settlement, prior to the date
> of preliminary approval by the Court. The Court is of the view, upon
> reconsideration, that it is possible that these watchmakers may not
> have known that their previous "opt-outs" (to the extent that there was
> a clear request for exclusion) were insufficient, because (1) notice to
> the watchmakers was effected by publication notice, rather than
> individual notice, and (2) Andre Fleury has been the source of
> incorrect or misleading information.

Docket No. 267 (Order at 1-2).

    However, even if the Court were to consider this contribution by Sacha Fleury, it is hard to
say that this was a substantial benefit to the members of the watchmaker subclass. To the extent the
supplemental notice to these class members may have generated additional opt outs, that did not
affect the terms of the final settlement approved by the Court. Hence, no "substantial benefit" was
conferred upon the class as a result of Sacha Fleury's effort.

    As a final point, it is worth noting that majority of Sacha Fleury's actions that were related to
the supplemental notice were actually more of a hindrance than of a help. First, Sacha Fleury
submitted at least two filings that were not requested by the Court. *See, e.g.*, Docket Nos. 250, 262
(Sacha Fleury's supplemental briefing on whether additional persons should be recognized as opt-
outs); Docket No. 265 (Sacha Fleury's comments regarding Settling Parties' proposed supplemental
notice). Second, and more important, there was inaccurate or misleading information in Sacha
Fleury's papers.

•   In his original objections, Sacha Fleury represented that "approximately 300 different
    watchmakers object to the settlement." Docket No. 224 (Sacha Fleury's Obj. at 2).

15

1   Subsequently, he backtracked somewhat, stating that there were "approximately 250-300"
2   watchmakers who rejected to the settlement.  Docket Nos. 250, 262 (Sacha Fleury's Resp. at
3   2).  This statement, however, was still misleading.  At best, there were approximately 250
4   documents that made up the Andre Fleury submission, not 250-300.  Furthermore, those 250
5   documents should not have been characterized as submissions from 250 different
6   watchmakers because some of those documents were duplicates, some of the documents --
7   although different -- came from the same person (*i.e.*, multiple submissions were made by the
8   same person), and some of the documents came from persons who clearly were not members
9   of the watchmaker subclass (*e.g.*, watchmakers outside the United States).  *See* Docket No.
10  257 (Order at 3 n.2) ("Andre and Sacha Fleury have represented that there approximately
11  300 watchmakers who are part of the Fleury submission.  The Court has reviewed the Fleury
12  submission and does not agree. There are approximately 250 communications from
13  watchmakers that make up the Fleury submission. About a dozen communications are
14  duplicative, *i.e.*, some watchmakers made more than one communication to Andre Fleury.");
15  Docket No. 229 (Keough Decl. ¶ 29) (noting that 23 persons who were part of the Andre
16  Fleury submission provided addresses outside the United States).  Sacha Fleury did not take
17  any time to vet through the 250 documents.  Had he done so, the number of persons who
18  were part of the Andre Fleury submission and who were plausibly part of the watchmaker
19  subclass would have numbered approximately 220.
20  • In his unsolicited comments on the Settling Parties' proposed supplemental notice, Sacha
21  Fleury argued that the list of persons to whom the supplemental notice should be sent was
22  incomplete.  *See* Docket No. 65 (Sacha Fleury's Comments at 1) (claiming that there were
23  additional watchmakers who should be on the list).  In a subsequent order, the Court noted
24  that this was completely unsupported.  *See* Docket No. 267 (Order at 2) ("The Court also
25  rejects Sacha Fleury's contention that the list of watchmakers to whom supplemental notice
26  should be sent is incomplete.  Sacha Fleury's contention is based on the declaration of Andre
27  Fleury.  The Court has reviewed Andre Fleury's 'master list' but it does not support his claim
28  that, '[e]xcluding foreign watchmakers, consumers, and watchmakers who attempted to

1  opt-out of the proposed settlement before preliminary approval, there are approximately 117
2  people that do not appear on Exhibit A, B, or C to the Proposed Order Regarding
3  Supplemental Notice.' Indeed, the Court notes that many of the people on the master list
4  were not even part of the Fleury submission to the Settlement Administrator."). It took a fair
5  amount of time for the Court to determine that the contention was without basis, especially
6  since Sacha Fleury did not even try to provide a list of the persons who purportedly should
7  be added to the supplemental notice list. Instead, all that he did was provide Andre Fleury's
8  master list, which as noted above included the names of many people who were not even part
9  of the Andre Fleury submission to the Settlement Administrator.

### 3. Adversarial Proceeding

Finally, Sacha Fleury argues that he should be awarded his attorney's fees because his actions in the litigation transformed the case into a truly adversarial proceeding. At least some courts have awarded an objector his or her fees on this basis.[5] It is not clear how the rationale of the common fund/common benefit doctrine would allow for the award of fees absent a showing that an actual benefit was conferred on the class. Nonetheless, assuming lower court decisions permitting fees are correct, the question is whether Sacha Fleury's actions, effectuated through his counsel, FW, truly enhanced the adversarial process.

The Court finds they did not. Sacha Fleury's objections did not bring to the Court's attention any issue not already raised by the Court *sua sponte* or raised by another independent party. *Cf.*

---

[5] *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96 Civ. 5283, 2004 U.S. Dist. LEXIS 8729, at *5 (E.D.N.Y. Apr. 27, 2004) (awarding objectors their fees even though their "briefings did not drive [the court's] decision to reduce Lead Counsel's request for fees" because "their arguments did sharpen the debate by introducing contrary case law, and by requiring Lead Counsel to more fully brief the issue in reply papers" so that "the objectors' contribution was to make the proceedings more adversarial"); *Great Neck*, 212 F.R.D. at 413 (awarding fees to an objector because he, *inter alia*, "aided the court and enhanced the adversarial process by generating debate about issues relating to the proposed settlement which otherwise would not have been discussed"); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 359 (N.D. Ga. 1993) (awarding fees to objectors who "significantly refined the issues germane to a consideration of the fairness of this complex settlement and[] transformed the settlement hearing into a truly adversarial proceeding"); *Frankenstein v. McCrory Corp.*, 425 F. Supp. 762, 767 (S.D.N.Y. 1977) (awarding obector his fees because objections, though ultimately overruled, were not frivolous, and the presence of objector represented by competent counsel transformed settlement hearing into truly adversarial proceeding -- *e.g.*, objections caused the court out to spend more hours analyzing and assessing complex settlement agreement and cast in sharp focus the question of fairness and adequacy of settlement to all members).

1   *Denny v. Jenkins & Gilchrist*, 230 F.R.D. 317, 353-54 (S.D.N.Y. 2005) (objector generated debate
2   and focused issues before the court which otherwise would not have been discussed).  Nor did his
3   objections result in any material changes to the settlement which substantially benefitted the class.
4   Thus, this case is distinguishable from *Great Neck*, 212 F.R.D. at 413-15, where such changes to the
5   settlement and contribution to the adversarial process were made, as well as the other cases
6   discussed, *supra*, where objectors contributed materially to either the settlement terms or process.  In
7   contrast, as noted above and described additionally below, Sacha Fleury's filing were often more of
8   a hindrance than a help to the adversarial process.  For example, Sacha Fleury:

- provided inaccurate or misleading information about the Andre Fleury submission;
- claimed that the benefits to the watchmaker subclass had no value without providing any evidentiary support;
- argued that there was a strong tying case without providing any real authority to support such;
- asserted that the attorney's fees were excessive (before the Court even issued any order awarding fees) without providing any substantive argument;
- challenged the adequacy of class counsel without providing any evidence that class counsel negotiated its fees as part of the settlement;
- arguing that the the court should first entertain objections to the settlement and then, after ruling on the objections, schedule a deadline to opt in or out of the settlement even though it is common practice for there to be simultaneous notice of class certification and settlement;
- arguing that a two-week response time was needed for the supplemental notice because watchmakers could be on vacation in Europe without any evidentiary support; and
- arguing that the supplemental notice should state that Andre Fleury had opted out even though this would clearly create a danger of bias.

///
///
///
///

Taking into account, *inter alia*, the above and the fact that Sacha Fleury conferred no substantial benefit on the watchmaker subclass, the Court cannot say that Sacha Fleury's actions truly advanced the adversarial proceedings.[6]

### 4. Amount of Fees

For the foregoing reasons, the Court concludes that Sacha Fleury did not provide any substantial benefit to the class and therefore his fee motion should be denied. As a final point, the Court notes that, even if Sacha Fleury's actions did provide some benefit to the class, it still would not award the fees sought.

First, the extent of any benefit provided by Sacha Fleury, if existent at all, was minimal. The fees sought -- *i.e.*, approximately $65,000 -- vastly exceed any benefit. *See Reynolds*, 288 F.3d at 288 (stating that principles of restitution that authorize result also require that objectors produce an improvement in settlement worth more than fee they are seeking; otherwise they have rendered no benefit to class); *see also Pasparage v. Riverstone Networks, Inc.*, 2007 U.S. App. LEXIS 28053, at *3 (9th Cir. Nov. 28, 2007) (stating that "[t]he fee awarded to objectors need only be reasonable under the circumstances") (internal quotation marks omitted).

Second, although Sacha Fleury is seeking only his fees, FW, his counsel, represented both Sacha Fleury and his father, Andre Fleury. Based on the record submitted, it does not appear that there was any allocation between the hours incurred by FW with respect to its representation of Sacha Fleury and the hours incurred by FW with respect to its representation of Andre Fleury. *See* Bailey Decl. ¶ 2 ("My co-counsel and I expended over 225.80 hours of professional time *in this case* since March 2008.") (emphasis added).

---

[6] If anything contributed to the adversarial process, it was Andre Fleury's *pro se* efforts to gather and organize opposition to the settlement. While much of Andre Fleury's activities were disruptive and violated the Court's order regarding inappropriate communication with class members, he did generate genuine opposition which raised a number of points considered by the Court and the Settling Parties. This organizing effort culminated in the collection of hundreds of class members allegedly opposed to the settlement which Andre Fleury presented to the Court directly himself, rather than through his counsel. *See* Docket No. 225 (order) (rejecting Andre Fleury's submission because he was now represented by counsel). This effort clearly preceded intervention by FW as counsel, who did not make an appearance in this case until March 17, 2008. There is nothing in the record establishing that attorney fees were incurred by FW in this organizing effort, and FW makes no such claim herein. Rather, the motion focuses on specific attorney activities and filings discussed above, all of which occurred after Andre Fleury generated opposition among the watchmaker subclass.

Third, even if all of FW's fees could be attributed to its representation of Sacha Fleury, not all of the hours incurred were spent on the alleged benefit to the class. For example, to the extent Sacha Fleury contends that he benefitted the class by reminding the Court about the sole discretion and scope-of-release issues, he has not identified the hours that were spent by FW on those issues. Notably, the record indicates that FW spent little time on these issues. *See* Docket No. 224 (in a six-page brief, devoting one paragraph to one of the issues and less than a page to the other); Docket Nos. 249, 261 (in a sixteen-page brief, devoting half a page to one of the issues and one page to the other). To the extent Sacha Fleury contends that he benefitted the class by helping the adversarial process, not all of his actions advanced the adversarial process. For example, in his second set of objections, Sacha Fleury focused a significant portion of his brief solely on an attack on class counsel, which was not supported by any evidence. *See* Docket Nos. 249, 261. And as noted above, many of his objections were entirely meritless and unsupported. Furthermore, Sacha Fleury has failed to provide sufficiently detailed documentation of fees to permit an appropriate allocation even if any fees were deemed awardable.

In sum, Sacha Fleury's motion is untimely and insufficiently documented. Moreover, he has failed to establish any entitlement to seek fees under CAFA, Rule 23(h), or the common fund/common benefit doctrine.

## II. CONCLUSION

Accordingly, Sacha Fleury's motion for attorney's fees is denied.

This order disposes of Docket No. 287.

IT IS SO ORDERED.

Dated: November 4, 2008

EDWARD M. CHEN
United States Magistrate Judge

20